812 P.2d 755

**Henry L. LEYDET, Julio J. Sillonis, Tim Corder, Plaintiffs–Appellants,**

v.

**CITY OF MOUNTAIN HOME, a Municipal Subdivision, Defendant–Respondent.**

**No. 18652.**

Court of Appeals of Idaho.

June 14, 1991.

McLaughlin Law Offices, Mountain Home, for plaintiffs-appellants. Michael R. McLaughlin, argued.

Hall & Friedly, Mountain Home, for defendant-respondent. Jay R. Friedly, argued.

WALTERS, Chief Judge.

This appeal arises from a dispute regarding a contract between Henry Leydet and the city of Mountain Home to have the city deliver treated wastewater to Leydet's farm for irrigation. The trial court found that performance under the contract had been affected by a drought and that the contract had been modified by the conduct of the parties. We affirm.

In 1980 Henry Leydet and Julio Sillonis, plaintiffs-appellants, entered into a written contract with the city of Mountain Home, Idaho, for the delivery of treated wastewater over a twenty-year period to irrigate farm land owned by Leydet and Sillonis. Tim Corder, also a plaintiff-appellant, is a lessee of the farm property. For purposes of this opinion, we will refer to the combination of appellants as "Leydet."

The contract provided that the city would deliver 510 acre feet of water per year to Leydet's farm; however, deliveries of no less than 80% and not more than 120% of 510 acre feet of treated water could be made—that is, not less than 408 feet and not more than 610 acre feet each year. The contract required the city to operate and maintain the treatment system. Delivery of the treated water was to begin in 1982 by way of an underground pipe from the final treatment lagoon directly to a corner of Leydet's adjacent land. The contract provided that the "effluent will be delivered throughout the irrigation season as nearly as practicable at a rate corresponding to the requirements of the crops." The landowner or the lessee was to present his planned water usage and crop schedule to the city each year. Then the city was to provide the requested amount of water, for which Leydet would pay monthly during the irrigation season.

The city's treatment system consists of a series of nine man-made lagoons in which the sewage and wastewater is held and treated for approximately one year. Six of these lagoons were pre-existing and three

were constructed during the early 1980's. The system is fed by wastewater from homes and businesses, groundwater infiltration (groundwater that leaks into the sewer system), inflow from roof drains, manhole covers, etc., and precipitation at the lagoons. After one year, the water at the lagoons is sufficiently treated to allow it to be used for irrigating specified crops. Accordingly, there is a one-year delay in the delivery of effluent from the lagoons to Leydet's farm.

Rainfall records kept by the United States Soil Conservation Service showed that the forty-year average rainfall for Mountain Home was 10.35 inches. The average annual rainfall from 1979 through 1988 was 11.43 inches. However, only 6.73 inches of rain fell in 1987, followed by only 9.06 inches in 1988. Apparently, due to this lack of precipitation, the Mountain Home Irrigation District could deliver only a fraction of the normal amount of water to its users in 1987 and 1988. In 1987, that fraction was two-thirds the normal amount; in 1988, the amount dropped to one-third; in 1989, the amount rose again to its average level.

Due to the lack of precipitation in the water season of 1986–1987 and 1987–1988, the groundwater level and its infiltration into the sewer system dropped. The evidence shows that the decrease in groundwater substantially contributed to the lack of effluent in the city's water treatment facility. Due to the one-year delay between treatment and delivery, the lack of precipitation in the water seasons of 1986–1987 and 1987–1988 created a shortage of treated water in the 1988 and 1989 irrigation seasons. Additionally, the evidence indicates that the city had problems with leakage in several of the lagoons due to the fragility of the bentonite liner used in constructing the lagoons.

When delivery of the treated water began in 1982, Leydet's lessee requested 304.5 acre feet and received 238.11. In 1983 he requested 418.5 acre feet and received 269.4. He received 254.02 acre feet in 1984, 250.12 acre feet in 1985, 281.94 acre feet in 1986, and 323.1 acre feet in 1987. During these years he requested more than he received. In 1988 he requested over 500 acre feet of water, but received only 47.5. This amount increased to 147.5 acre feet in 1989 after a request for 377 acre feet.

In 1990, Leydet sued the city seeking damages allegedly suffered because the city failed to deliver the full amount of effluent requested in 1988 and 1989. The trial court, sitting without a jury, determined that because of the lack of precipitation in 1987 and 1988, Mountain Home had experienced a drought which excused the city from fully performing on the contract. The court found that although the city could have taken steps to increase the amount of water to the lagoons and to Leydet's land, those steps would have been prohibitively expensive, thus performing was impracticable and nonperformance was excused. Moreover, the court found that the parties had modified their contract because Leydet had, over the years, accepted less effluent than specified in the contract.

Leydet contends that the court erred in three respects. His first argument is that the court erroneously found that the appellants modified their written contract for the delivery of treated water by accepting less than the contract amount over several years. The second argument is that the court erred when it found that the water shortage, which affected Mountain Home during 1987 and 1988, was an "act of God" excusing the city's incomplete performance. Third, Leydet asserts that the court erred when it allowed defense counsel to prepare the court's findings of facts and conclusions of law.

■ Our standard of review in this case involves two appellate principles. First, the trial court's findings of fact will not be set aside unless clearly erroneous, i.e., unsupported by substantial and competent evidence. I.R.C.P. 52(a); *Muniz v. Schrader,* 115 Idaho 497, 767 P.2d 1272 (Ct.App.1989). Second, where a judgment of the trial court is based upon alternative grounds and the judgment can be affirmed on one of the grounds, the fact that an alternative ground may have been in error is of no

consequence and may be disregarded. *Fischer v. Fischer*, 92 Idaho 379, 443 P.2d 463 (1968).

We turn first to the trial court's determination that the parties—by their conduct—modified their contract with respect to the quantity of effluent to be delivered each year. The fact that the City delivered *all* effluent from its treatment plant to Leydet but in an amount less than that required by the contract, coupled with the fact that—over the years and except for 1988—Leydet's lessee requested and received *less* than the amount specified in the written contract, raises a serious question whether the specified amount in the contract was a basic misconception about the deliverable amount. This underlying question may be answered by considering whether the parties initially were mutually mistaken.

We have held that a mistake is an unintentional act or omission arising from ignorance, surprise, or misplaced confidence. *Bailey v. Ewing*, 105 Idaho 636, 638, 671 P.2d 1099, 1101 (Ct.App.1983). The mistake must be material, that is, so substantial and fundamental as to defeat the object of the parties. *Id.* A unilateral mistake usually does not offer grounds for relief, although it may in certain circumstances. *Id.* A mutual mistake, which will provide grounds for relief, occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain. *Id.* Some courts require the parties to have the same misconception about the same basic assumption or vital fact. *Id.* However, the doctrine of mutual mistake also includes situations where the parties proceed with different misconceptions concerning the same basic assumption or vital fact. *Id.* We adhere to the latter view and require that the assumption of fact held by both parties must be the same for the doctrine of mutual mistake to apply. *Id.*

The assumption of fact in the instant case was that there would be enough water flowing into the lagoons to enable them to operate efficiently and as designed. The city's misconception was that it could produce more treated effluent than it has proved capable of producing, that is, 500 acre feet per year. The evidence shows that 500 acre feet of effluent has never been available for delivery to Leydet. A rough average of approximately 250 acre feet of water was delivered in the years of normal precipitation. Leydet's misconception appears to be that he could actually use 500 acre feet of effluent in a year. The evidence shows that although Leydet requested more treated water than he received over several years, he received approximately what he was capable of using. Importantly, he testified that in the years before 1988 he received all the water he could use. Further, the evidence shows that in 1986 he received more than he could use.

We find this case to be analogous to *Thieme v. Worst*, 113 Idaho 455, 745 P.2d 1076 (Ct.App.1987), in which a mutual mistake was found concerning a land sale contract where both the seller and the purchaser believed that water could be delivered to the land for irrigation. Unfortunately for both, a concrete barrier had been constructed preventing delivery of the water. The land was purchased and sold with water being an essential and vital element of the sale. Because delivery of water was vital and both parties had been mistaken regarding it, the court "reshaped" the contract to achieve a just result and to reflect the intent and desires of the parties.

In the case at hand, both parties believed that enough water would flow into the lagoons to allow the contracted amount of treated water to flow out to Leydet. The availability of water for treatment was vital to the beliefs of both parties when they entered into the contract. Leydet, however, asserted at oral argument that if there was a mistake it was made by the city in its prediction of the inflow into the lagoons. In its memorandum decision, the court did find that because of weather and construction problems, alterations to storm sewer access, apparent miscalculations as to water input into the lagoons, and the rate of evaporation and leakage while the water was in the lagoons, "nothing close to

the [contract amount] was ever delivered to the landowners." However, the court also found that until 1988 the water delivered to Leydet was effectively all the water he could use, and in 1986, he received more water than he could use. The record supports these findings. Further, the court found that any efforts the city could make to increase the wastewater in the lagoons, such as to "spike" them with well water or to replace the bentonite liners with plastic ones, would be so extreme that such steps were impracticable and did not bear reasonable consideration. We agree, and based on the foregoing evidence, conclude that the parties were mutually mistaken as to the amount of water which was deliverable from the lagoons.

Leydet asserts that he requested and accepted less than 500 acre feet of water per year for several years because he knew the city was having trouble with the lagoons and he wanted to be reasonable with his requests. However, the record supports the court's conclusion that Leydet, or more specifically, the lessee Corder, always received the amount of water that he could use and that in 1986 he actually received more than he could use. The trial court stated that it was "satisfied from the evidence that by 1988, the parties, by their conduct, had treated the agreement as requiring the City to deliver, and the landowners to accept, all effluent available after evaporation and leakage, which regularly amounted to 240 to 270 acre/feet." We interpret this language to mean that the city would deliver the amount of effluent which time had proved it was capable of producing, and that time had proved Leydet was capable of using. We find that substantial evidence supports the trial court's findings and conclusions with regard to modification of the contract by conduct of the parties.

Leydet next argues that the trial court erred in concluding that the city was excused by an "act of God" from delivering the amount specified in the written con-

tract.[1] From our review of the district judge's memorandum decision, we conclude that the appellants have mischaracterized the court's determination. After reciting that the parties had modified the contract by their conduct, the court held:

> That in 1988, due to drought conditions which substantially reduced the irrigation and groundwater in the area, only about 47 acre/feet was available. I am satisfied that it was impracticable for the city to deliver a greater amount of effluent in 1988 to the landowners because of the drought, and performance was excused in accord with *Landis v. Hodgson*, 109 Idaho 252, 256–8 [706 P.2d 1363, 1367–69 (Ct.App.1985)].

> Considering all the circumstances, including the terms of the agreement, it is apparent that a drought of the magnitude experienced here was an event, the non-occurrence of which was a basic assumption on which the "specified amount" in the agreement was computed.

Essentially, as we also have concluded, the district court was expressing its opinion that the parties were mutually mistaken as to a basic assumption relied upon when entering into the contract. The court never used the term "act of God" in its memorandum decision or in its findings of fact and conclusions of law. Consequently, we do not deem the court's language to be a finding that the city's performance was excused under the "act of God" provision in the contract. Moreover, even if the court's statement should be construed as an application of the doctrine of "act of God" to the drought conditions during the time period involved in this case, we need not pass upon the correctness of that position, having already concluded that the court's judgment can be upheld on the alternative determination that the parties modified their contract by their conduct. *Fischer v. Fischer*, 92 Idaho 379, 443 P.2d 463 (1968).

---

1. The contract contained a provision relieving the city of its obligation to deliver "the treated wastewater effluent herein specified if effective-

ly prevented from doing so by an act of God...."

Finally, Leydet asserts that the court erred when it instructed defense counsel to write the court's findings of fact and conclusions of law. We find no merit to this issue. We have compared the findings of fact and conclusions of law to the court's memorandum decision, preceding the preparation of those findings and conclusions. We find no reversible error. *Seaport Citizens Bank v. Dippel,* 112 Idaho 736, 735 P.2d 1047 (Ct.App.1987).

In passing, we note that the questions presented in this case could have been resolved by arbitration, without direct involvement of the court. The contract expressly provided for mandatory arbitration in the event of a dispute. Neither party enforced this provision when the dispute arose. The trial court also made no mention of the arbitration clause. Contract terms are included to govern the actions of the parties involved. When the parties fail to abide by written terms, the contract becomes a meaningless piece of paper. The arbitration clause should have been followed.

In conclusion, we hold that the record demonstrates that the parties were mutually mistaken as to the amount of wastewater that would flow into the lagoons and thus out of the lagoons for delivery to Leydet. Also, the parties were mistaken as to the amount of water Leydet would use per year. Because Leydet requested and accepted less than the contract amount of treated wastewater per year and because the record indicates that he received what he was capable of using, his conduct modified the contract.

We strongly advise the parties that, in view of today's decision, they should renegotiate their contract or seek a reformation of the agreement in district court. This lawsuit was for damages allegedly incurred in 1988 and 1989 only. It does not affect later years. Without a change in the document, the same situation that gave rise to the present lawsuit could arise again later. It is not our goal to issue a decision which the courts will have to revisit in the future.

We affirm the judgment of the trial court. Costs to respondent city. No attorney fees on appeal.

SWANSTROM and SILAK, JJ., concur.