844 P.2d 691

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Danny R. GLEASON, Defendant– Appellant.**

**No. 19388.**

Supreme Court of Idaho,
Coeur D'Alene, October 1992 Term.

Dec. 22, 1992.

Frederick G. Loats, Coeur d'Alene, for defendant-appellant.

Larry EchoHawk, Atty. Gen. and Michael J. Kane, Chief, Criminal Div., argued, Boise, for plaintiff-respondent.

McDEVITT, Justice.

## STATEMENT OF THE CASE

Defendant was arrested and charged by a Uniform Traffic Citation with having "operated a motor vehicle while under the influence of alcohol and/or with a Blood Alcohol Content of .10% or above" in violation of I.C. § 18–8004, on August 29, 1988. Defendant pled "not guilty" and a trial was held before a jury on June 15, 1989.

In the early morning hours of August 29, 1988, Officer Alex Carrington noticed a white Thunderbird travelling south on Highway 41 that appeared to be weaving in its lane. Officer Carrington followed the vehicle for approximately eleven miles and radioed for help from the county. Officer Carrington testified that he could see the car clearly the entire time he followed it and that there were no other cars on the road. He also testified that he observed the car meander back and forth several times between the curb and center line. Shortly after receiving the radio call, Deputy Wolfinger of the County Sheriff's Office

pulled in between the white Thunderbird and Officer Carrington's marked police car. Deputy Wolfinger followed the car onto a main thoroughfare, observing the vehicle drift and jerk back at least three times, at which point he activated his lights and pulled the vehicle to the side of the road.

At trial, the court allowed a tape recording of the subsequent interchange between the defendant Gleason, driver of the white Thunderbird, and Deputy Wolfinger, up to the moment of defendant Gleason's arrest for driving under the influence. Deputy Wolfinger's testimony and arrest report also recited the same sequence of events. When Deputy Wolfinger first contacted Gleason, he noticed a moderate odor of alcohol on Gleason's breath and that Gleason's eyes were watery and bloodshot. Moreover, the deputy noticed a plastic cup on the transmission hump containing a liquid later verified as alcohol. Deputy Wolfinger requested Gleason to step from the vehicle and perform a series of field sobriety tests. Deputy Wolfinger has an Associate of Science Degree in Law Enforcement, has received training by experienced field officers, and has attended two training seminars on improving recognition of intoxicated persons and administration of the tests. In addition, Wolfinger has performed the field sobriety tests over 200 times in the past five years. Every DUI arrest he has made based upon these tests was verified by an Intoximeter 3000 Blood Alcohol Content ("BAC") test.

Deputy Wolfinger performed five tests on Gleason: the horizontal gaze nystagmus ("HGN") test, one-foot balance test, alphabet test, finger counting test, and hand-slap dexterity test. Gleason performed very poorly on each test. Gleason exhibited the onset of nystagmus prior to 45 degrees and could not maintain maximum deviation, he could not stand on one foot for more than 10 seconds, he could only recite the alphabet to "O", he could not touch and count his own fingers in the proper order, even after several explanations and demonstrations by the deputy, and he could not keep the simple hand-slapping rhythm. Based on Gleason's performance, Deputy Wolfinger was of the opinion that Gleason was

under the influence of alcohol, and arrested and charged Gleason accordingly.

Appellant Gleason objected at trial to the admission of evidence concerning the HGN test based on lack of foundation. After a brief debate out of the presence of the jury, the trial court found that the foundation for the admissibility of the HGN test was satisfied by Deputy Wolfinger's testimony of past testing experience and independent verification of his accuracy. The court allowed Deputy Wolfinger to testify that he administered the test, to give his opinion based on his observations in administering the test, and to state that nystagmus, or eye-jerking, prior to 45 degrees is a "strong indicator that he's under the influence of alcohol." The court struck the word "strong". On cross, appellant delved even further into the controversial quagmire of the HGN test, and failed to object when he evoked the response from Deputy Wolfinger that nystagmus prior to 45 degrees "is a good indicator of alcohol content above a .10 percent."

In addition to Deputy Wolfinger's testimony, the State offered the testimonies of Officer Carrington and Chaplain Greg Linnebach, who was in the marked sheriff's car with Wolfinger. The two testified that, based on their own training and experience in the administration of field sobriety tests and their personal observations of Gleason's erratic driving pattern and uncoordinated mannerisms, they each formed the opinion that Gleason was intoxicated. Specifically, Gleason swerved in his lane several times and had somewhat slurred speech, the smell of alcohol was strong on his breath, and his movements seemed slow and deliberate. The prosecution presented evidence to show that defendant was driving under the influence, but failed to present any evidence that defendant had a BAC over .10 percent. Therefore, upon motion of the defendant, the court struck the second part of the pleadings relating to BAC levels.

Gleason had two friends testify that, subsequent to drinking with Gleason at a bar in Rathdrum, they pursued Gleason for a few miles on I–90 and never saw anything

"out-of-the-ordinary" with his driving and that he was not intoxicated. One of the friends, a former police officer, stated that he would not have let Gleason drive if he had thought he was under the influence of alcohol.

At the close of defendant's case, the court instructed the jury on the term "under the influence" as follows:

> You are instructed that to constitute the crime of driving while under the influence of alcohol, it is not necessary to show how much or the type of alcoholic beverages that were consumed. It is necessary to show that the driver had consumed sufficient alcoholic beverages to influence or affect his judgment or ability to drive a motor vehicle.

The jury found defendant guilty of driving under the influence and judgment and sentence were entered June 29, 1989. The defendant thereafter appealed to the district court. The district court affirmed the judgment and sentence, by written memorandum filed May 30, 1991. The issues on appeal are

I.  Whether the trial court erred in admitting testimony concerning the horizontal gaze nystagmus test performed on appellant.

II. Whether the jury was properly instructed on the elements of the crime of driving under the influence.

### STANDARD OF REVIEW

■ With respect to the admission of evidence, the trial court has broad discretion and its judgment in the fact finding role will only be disturbed on appeal when there has been a clear abuse of discretion. *State v. Crea*, 119 Idaho 352, 806 P.2d 445 (1991); *State v. Giles*, 115 Idaho 984, 772 P.2d 191 (1989). On the issue of the jury instruction, we review the same to determine whether it charges the jury with all matters necessary for their information with respect to the nature and elements of the crime charged. *State v. Beason*, 95

Idaho 267, 275, 506 P.2d 1340, 1348 (1973). The question of whether the jury was properly instructed is a question of law over which we exercise free review. *State v. Roll*, 118 Idaho 936, 938, 801 P.2d 1287, 1289 (Ct.App.1990).

### I.

### ADMISSIBILITY OF THE HGN-RELATED TESTIMONY

■ In *State v. Garrett*, 119 Idaho 878, 811 P.2d 488 (1991), this Court recognized the admissibility of HGN-related testimony. *State v. Garrett* is a plurality opinion. It is authoritative on the issue of the scientific reliability of HGN test evidence, however it is not authority for the appropriate test against which such scientific reliability is to be measured. In *Garrett*, Justice Bistline developed a foundational test for the prosecution to satisfy in order to admit HGN evidence. First the prosecution must establish that the HGN test is independently reliable under the *Frye* standard (generally accepted theory in the scientific community that persons who are intoxicated exhibit nystagmus), and second that the officer is competent and reliable enough to introduce HGN evidence and testify that nystagmus may be an indication of intoxication. *Garrett*, 119 Idaho at 882, 811 P.2d at 492. Chief Justice Bakes concurred, while Justice McDevitt concurred in the result only. Justice Boyle specially concurred, rejecting the use of the *Frye* standard as the measure of scientific reliability. *Id.* at 883, 811 P.2d 488. Justice Johnson penned a dissent in which he objected to the use of the *Frye* standard, advocating a standard of independent reliability, and found the trial court's use of HGN test results as indicative of a particular BAC level, to be prejudicial error. *Id.* at 884, 811 P.2d 488. This Court reaffirms that the appropriate test for measuring the scientific reliability of evidence is I.R.E. 702.[1]

1.  Idaho Rules of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

*Garrett* allows the use of HGN test evidence only in conjunction with evidence from other field sobriety tests, and permits the arresting officer to testify only that nystagmus *may be* an indicator of intoxication, not that it is conclusive evidence. *Garrett* limits the scope of the admissibility of HGN-related evidence, forbidding its use to establish or infer any particular correlative BAC level, because nystagmus does stem from causes other than the ingestion of alcohol.

The trial court in this case did not venture beyond the permissive bounds of *Garrett* when it allowed Deputy Wolfinger to testify that based on Gleason's performance on the HGN *and other* tests, Deputy Wolfinger was of the opinion that Gleason was intoxicated. It is true that Wolfinger also testified that nystagmus was an indicator of BAC over .10 percent, however, this testimony was elicited on cross-examination. Appellant cannot now be heard to denounce testimony that he roused. This constitutes invited error. *State v. Owsley*, 105 Idaho 836, 837–38, 673 P.2d 436, 437–38 (1983). Deputy Wolfinger's testimony relating to the HGN test results was not offered as independent scientifically sound evidence of Gleason's intoxication. Rather, it was offered and admitted for the same purpose as other field sobriety test evidence—a physical act on the part of Gleason observed by the officer contributing to the cumulative portrait of Gleason intimating intoxication in the officer's opinion.

## II.

### JURY INSTRUCTION

The proper jury instruction for the crime of driving under the influence can be found in *State v. Glanzman*, 69 Idaho 46, 202 P.2d 407 (1949). In *Glanzman*, this Court held that the driver need

not be shown to have been in any particular degree or state of intoxication, but only to have consumed intoxicating liquor to such extent as to influence or affect his *ability to drive*. *Glanzman*, 69 Idaho at 49, 202 P.2d at 410. *See also State v. Warner*, 97 Idaho 204, 541 P.2d 977 (1975); *State v. McFarland*, 88 Idaho 527, 534, 401 P.2d 824, 831 (1965). The appellant argues that the insertion of the word "judgment" into the jury instruction contravened the standard set out in *Glanzman* and was misleading to the jury.[2] We are of the opinion that, in this case, the instruction was proper under the canopy of *Glanzman*. The reference to "his judgment" in this instruction describes a mental function that directly relates to defendant's ability to drive a motor vehicle. It is difficult to conceive of an instance where impaired judgment, which dictates reaction time, offensive and defensive tactics, and timing, does not absolutely translate into impaired ability, however, *Glanzman* does not approve the use of the term "judgment" and we would admonish future courts to avoid its employ.

As to defendant's second contention, the instruction clearly distinguishes "degree of intoxication" to inform the jury that they need not discern some magic number to represent Gleason's state and glean its conclusion of "driving under the influence" from that. Rather, the court's reference to "degree of intoxication" denotes a question of fact as to whether the driver consumed sufficient alcoholic beverages to thrust him into the realm of the continuum that represents persons whose ability to drive is influenced or affected by the alcohol.

For the foregoing reasons, the decision of the district court is affirmed.

No costs on appeal.

BAKES, C.J., and JOHNSON, and TROUT, JJ., concur.

---

**2.** The respondent raises the argument that the appellant is estopped from raising the issue of prejudicial and misleading jury instructions on appeal because he failed to object at trial according to *State v. Stuart*, 110 Idaho 163, 170, 715 P.2d 833, 840 (1986). We find this argument meritless, as the controlling case for this issue is *State v. Smith*, 117 Idaho 225, 229, 786

P.2d 1127, 1131 (1990). In *Smith*, this Court explained the state of the law after the Court amended I.C.R. 30 in 1980, which is the underlying rule. The *Smith* Court held that a party no longer need raise a jury instruction objection at trial to preserve the issue for appeal. This rule applies to all prosecutions where the precipitating incident occurred after 1980.

BISTLINE, Justice, concurring in the result in Part I.

This one justice[3] concurs with the majority to the extent of the holdings that: 1) HGN evidence is admissible in evidence as an indicator of intoxication; 2) evidence elicited by the defendant may not be challenged by him/her on appeal; and 3) the insertion of the word "judgment" in the jury instruction in issue was not reversible error. However, I can only concur in the result in Part I of the majority's opinion because I disagree with the majority's abandonment of the test for scientific reliability, which test was set forth in *State v. Garrett*, 119 Idaho 878, 880, 811 P.2d 488, 490 (1991). I am especially troubled about the total lack of guidance given to the bench and bar relative to determining whether evidence is scientifically reliable enough to be admitted into evidence under I.R.E. 702.

First, the majority's statement about the proper measure of the scientific reliability of evidence is not necessary to the decision. As the majority notes, *Garrett* "is authoritative on the issue of the scientific reliability of HGN evidence." The question whether HGN evidence is scientifically reliable having already been resolved, the majority's statement that "the appropriate test for measuring the scientific reliability of evidence is I.R.E. 702[ ]" is *dicta.*

Second, the majority's bare statement that I.R.E. 702 is the appropriate test provides no guidance to the bench and bar as to how to determine scientific reliability. I.R.E. 702 only states that a qualified witness may testify as to scientific, technical, or other specialized knowledge if that testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Questions that come to mind include: What level of scientific reliability, if any, is required before evidence will assist the trier of fact? What constitutes scientific reliability? How reliable does scientific evidence have to be before it is admissible?

On whose scale do we measure the amount of reliability? What unit of measure is being used? How can trial judges hope to apply a uniform test for reliability when neither I.R.E. 702 nor the Court provides any guidance? On what foundational basis are judges and lawyers considered better equipped to determine scientific reliability than is the scientific community? The majority does not enlighten us.

Although the majority seems to assume the determination of scientific reliability under I.R.E. 702 has been clearly established, in fact a review of the cases interpreting Federal Rule of Evidence 702, or an analogous state provision, shows there is significant disagreement as to the effect of *Frye* on Rule 702. *See Mustafa v. United States*, 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986) (White, J., joined by Brennan, J., dissenting on denial of petition for writ of certiorari on the ground that the Court should resolve the split in authority over the applicability of the *Frye* test to a rule 702 analysis).

Some courts have rejected the *Frye* test in favor of a broad admissibility standard. *See, e.g., State v. Murphy*, 451 N.W.2d 154, 156 (Iowa 1990); *Kelly v. State*, 792 S.W.2d 579, 584–85 (Tex.App.1990). Some courts have adopted, as did *Garrett*, the *Frye* test as part of their rule 702 analysis. *See, e.g., United States v. Boise*, 916 F.2d 497, 503 (9th Cir.1990); *United States v. Two Bulls*, 918 F.2d 56, 60 n. 7 (8th Cir.1990); *United States v. Smith*, 869 F.2d 348, 353 (7th Cir.1989). Some other courts have constructed a less-stringent version of the *Frye* test to use in its F.R.E. 702 analysis but have not abandoned it altogether. *See United States v. Gould*, 741 F.2d 45, 48–49, n. 2 (4th Cir.1984); *United States v. Downing*, 753 F.2d 1224, 1237–39 (3d Cir. 1985). In short there is a conflict among the state and federal courts as to the interplay between rule 702 and the *Frye* test. All of these cases, it should be emphasized,

---

**3.** An appellation bestowed on Bistline, J. by the Supreme Court of the United States in referring to a view "[o]ne justice" espoused. *Lankford v.*

*Idaho,* — U.S. —, —, 111 S.Ct. 1723, 1728, 114 L.Ed.2d 173 (1991).

interpret the same language at issue here. Which of these views, if any, does the majority suggest that the trial judges of this state are to follow? [4]

Moreover, Idaho law is not clear as to the effect of *Frye* on I.R.E. 702. In *State v. Iwakiri*, 106 Idaho 618, 623–24, 682 P.2d 571, 576–77 (1984), a case decided prior to the adoption of the Idaho Rules of Evidence, we discussed the *Frye* rule but then adopted a case by case approach limited to the question of the admissibility of hypnotically induced testimony. (In that sense, *Iwakiri* was really a witness competency case, not an admission of expert testimony case.) In *State v. Crea*, 119 Idaho 352, 355, 806 P.2d 445, 458 (1991), a case involving the admissibility of alcohol breath tests from an "Intoximeter 3000" with the Taguchi cell deactivated, we cited to *Iwakiri* in a footnote and then "decline[d] to adopt the *Frye* criteria as the basis of scientifically derived evidence *as relates to the issues presented in this appeal*." (Emphasis added.) We then went on to hold that the Intoximeter 3000 evidence in that case was admissible, in part because it had "gained scientific acceptance." 119 Idaho at 355, 806 P.2d at 458. (In other words, the evidence was admissible under the *Frye* test.) Recently, this Court over-read *Crea*'s narrow holding and implied that *Crea* had rejected the *Frye* altogether. *State v. Rodgers*, 119 Idaho 1047, 1049, 812 P.2d 1208, 1210 (1991). In discussing *Frye*, the Court in *Rodgers* did not even mention *Garrett*, which had been decided only one month earlier. The majority went on to hold that the admission of blood splatter evidence under I.R.E. 702 was not an abuse of the trial court's discretion "[g]iven the widespread acceptance of this evidence of other courts and the fact that Rule 702 favors admissibility of expert testimony[.]" 119 Idaho at 1051, 812 P.2d at 1212. How a trial court is to determine the admissibility of evidence which has not gained the widespread acceptance of other courts was not made clear.

The opinions discussed above are not models of clarity and provide no real guidance to the bench and bar as to how to determine whether scientific evidence is reliable enough to permit its admission. Today's opinion does nothing to clarify the law. As I have noted previously, my concern is not so much that *Frye* is rejected but that

> [i]f *Frye* is rejected it must be replaced with something. Otherwise, every form of "scientific" evidence, even evidence that does not deserve that label, will be admissible for the jury's consideration. Such prejudice in a criminal trial is improper.

*State v. Rodgers*, 119 Idaho 1041, 1054–55, 812 P.2d 755, 768–69 (1991) (Bistline, J., dissenting).

At this juncture it appears that the law would be better served by adhering to the familiar *Frye* rule rather than sending the bench and bar down the dismal road of litigation without a road map. How a supreme court decides to govern the admission of scientific evidence is an important question which should be carefully considered and decided only after full briefing by the parties. Here the majority, having raised the question on its own volition, announces an ill-defined rule which leaves the reader without any clue as to the applicable *ratio decidendi.*

---

4. Fortunately for the federal courts, it appears that the United States Supreme Court has recently accepted review of a case in order to resolve the conflict between federal circuits. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 951 F.2d 1128 (9th Cir.1991) *cert. granted,* —— U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992).