948 P.2d 1123

Roland L. (Von) WALKER and Dorothy Walker, husband and wife, d/b/a Walker Farms; Richard A. Egbert Limited Partnership, an Idaho Limited Partnership, Richard Egbert and Alta Egbert, General Partners; Wright Brothers Company, Inc., an Idaho corporation, Plaintiffs–Respondents–Cross Appellants,

v.

AMERICAN CYANAMID COMPANY, Defendant–Appellant–Cross Respondent.

No. 22822.

Supreme Court of Idaho, Idaho Falls, September 1997 Term.

Dec. 2, 1997.

Evans, Keane, Boise;. Faegre & Benson, Minneapolis, MN, for appellant. Winthrop A. Rockwell argued.

McGrath, Marotz & Smith, Idaho Falls; Baker & Harris, Blackfoot; Racine, Olson, Nye, Cooper & Budge, Pocatello, for respondents. Dwight E. Baker and Gary L. Cooper argued.

JOHNSON, Justice.

This is a products liability case. We conclude: (1) federal law does not preempt the claims for breach of express warranty; (2) a limitation of liability provision on the product label is unenforceable because it is unconscionable; (3) there was sufficient proof of causation and damages; (4) pursuant to section 6–1606 of the Idaho Code (I.C.) the trial court correctly reduced the damages awarded for seed loss by the amount of crop loss insurance; and (5) attorney fees are proper under the commercial transaction provision contained in I.C. § 12–120(3).

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

In 1988, 1989, and 1990, Walker Farms (Walker) purchased an herbicide, ASSERT, manufactured by American Cyanamid Company (Cyanamid) to use on fields where Walker grew grain and potatoes in rotation. A Cyanamid employee told Walker that ASSERT posed absolutely no risk to potatoes, that ASSERT was safe, and that ASSERT did not even harm potatoes when sprayed directly on the plants. Walker applied ASSERT to its grain crops in 1988 and 1989 and then planted potatoes in the same fields.

The label on the ASSERT Walker purchased states that potatoes may be planted in rotation after applying ASSERT at recommended rates in certain grain crops. A disclaimer on the ASSERT label states:

The label instructions for the use of this product reflect the opinion of experts based on field use and tests. The di-

rections are believed to be reliable and should be followed carefully. However, it is impossible to eliminate all risks inherently associated with use of this product. Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the use or application of the product contrary to label instructions, all of which are beyond the control of American Cyanamid Company. All such risks shall be assumed by the user.

American Cyanamid Company warrants only that the material contained herein conforms to the chemical description on the label and is reasonably fit for the use therein described when used in accordance with the directions for use, subject to the risks referred to above.

Any damages arising from breach of this warranty shall be limited to direct damages and shall not include consequential commercial damages such as loss of profits or values or any other special or indirect damages.

American Cyanamid Company makes no other express or implied warranty, including other express or implied warranty of FITNESS or of MERCHANTABILITY.

Walker's potato crops, which were harvested in 1989 and 1990 on the same fields where Walker applied the ASSERT to its grain crops in 1988 and 1989, were irregular and substandard. Walker planted grain on these fields in 1990 instead of potatoes in order to avoid potato crop injury in 1991.

Walker sued Cyanamid for damages on numerous theories, including breach of express warranty. Among its defenses, Cyanamid contended that the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136–136y, preempted Walker's express warranty claims and that the limitation of liability provision contained on the ASSERT label limited Walker's recovery to a return of the purchase price. Walker contended that FIFRA does not preempt its express warranty claims and that the limitation of liability provision on the ASSERT label is unconscionable. The trial court ruled that FIFRA does not preempt Walker's express warranty claims and, after hearing all the evidence at trial, ruled that the limitation of liability provision on the ASSERT label is unconscionable. The trial court made the following findings to support its unconscionability ruling:

(1) Cyanamid's representative advised Walker that the use of ASSERT was safe for Walker's operation, its course of conduct proceeded on this premise, and Walker's assessment of the risks was influenced by Cyanamid's representatives;

(2) Walker had no alternative but to accept the exclusion because any product Walker purchased would have a similar disclaimer; and

(3) enforcement of the clause would leave Walker without any substantial recourse for any losses caused by ASSERT.

When Cyanamid raised the unconscionability issue again in post-trial motions, the trial court made the following additional statements in denying the motions:

As a further rationale for its unconscionability ruling, the court notes that this case involved a continuing relationship between two large commercial enterprises. The court is aware that it is not uncommon for such entities to enter into contracts for limitation of liability. However, when that occurs, both parties are aware of what could happen and why. This allows them to structure the contract in accordance with their relative positions, intent, and expectations.

This case involves a warranty rather than a negotiated contract. But negotiation is not the main issue. The issue is the expectations regarding other risks involved. It is one thing to accept the risk that a product will not perform its expected function, and quite another to accept the risk that it will have the unexpected result of causing harm for several years after application. Despite the rotational crop injury statement, it is simply unfair to shift this risk to the buyer.

The jury returned a verdict for Walker on its claims for (1) breach of written express warranty for its purchases of ASSERT in 1988, 1989, and 1990; (2) breach of oral express warranty in 1988 and 1989; and (3)

breach of Idaho Consumer Protection Act, I.C. § 48–601 to 48–619, for the 1988 purchase.

The jury awarded Walker $3,428,703 in damages for potato crop losses and increased expenses. The trial court reduced this award by $315,333, the amount of crop insurance Walker received. The trial court also awarded Walker attorney fees pursuant to I.C. § 12–120(3) and § 48–608. Cyanamid appealed, and Walker cross-appealed.

## II.

### FIFRA DOES NOT PREEMPT WALKER'S EXPRESS WARRANTY CLAIMS.

Cyanamid asserts that Walker's express warranty claims are preempted by FIFRA. We disagree.

■ Under the Supremacy Clause of the United States Constitution, state law that conflicts with federal law is without effect. *Zimmerman v. Volkswagen of America, Inc.,* 128 Idaho 851, 855, 920 P.2d 67, 71 (1996). When a federal statute includes a provision that expressly preempts state law, courts need not go beyond the statutory language. The task is simply one of statutory interpretation to " 'identify the domain expressly preempted' by that language." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, ——, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996) (quoting *Cipollone v. Liggett Group,* 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)).

■ There are two presumptions we must consider in determining whether FIFRA preempted Walker's express warranty claims. "First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2250. Therefore, in preemption cases, particularly in those cases where Congress has legislated in an area traditionally occupied by the States, courts should "start with the assumption that the historic police powers of the States were not to be superseded by [federal legislation] unless that was the clear and manifest purpose of Congress." *Id.*

■ Second, the scope of a statute's preemption is guided by the proposition that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Id.* (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963)). Thus, the scope of a statute's preemption must rest primarily on "a fair understanding of *congressional purpose.*" *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2250 (italics in original) (quoting *Cipollone,* 505 U.S. at 530, n. 27, 112 S.Ct. at 2624, n. 27).

■ Congressional intent is discerned primarily from the language of the preemption statute and the statutory framework surrounding it. *Medtronic,* 518 U.S. at —— ——, 116 S.Ct. at 2250–51. "Also relevant, however, is the structure and purpose of the statute as a whole as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* at ——, 116 S.Ct. at 2251 (citation and internal quotes omitted).

Under FIFRA, the Environmental Protection Agency (EPA) is vested with the authority to regulate the use, sale, and labeling of pesticides. 7 U.S.C. §§ 136a, 136w. "Pesticide," as defined by FIFRA, includes herbicides like ASSERT. 7 U.S.C. § 136(u). No pesticide may be sold which is not registered with EPA. 7 U.S.C. § 136a(a). As part of the registration process an applicant must submit "a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use." 7 U.S.C. § 136a(c)(1)(C). EPA regulations implementing FIFRA require pesticide labels to include a rotational crop statement, but do not specify the content of this statement. 40 C.F.R. § 156.10(i)(2)(x)(B).

FIFRA contains the following provisions concerning the authority of states:

(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

The narrow question we must address is whether allowing Walker to recover damages based on its express warranty claims constitutes a requirement for labeling or packaging in addition to or different from those required by FIFRA. Stated differently, the question is whether EPA, acting pursuant to FIFRA, required Cyanamid to warrant on the ASSERT label that potatoes may be planted after applying ASSERT to grain crops.

■ EPA did not require that the rotational crop statement on the ASSERT label include any particular crop that may be planted after applying ASSERT to a field where grain is planted. Therefore, Cyanamid's statement that potatoes may be planted as a rotational crop was not required but was voluntary. Cyanamid also voluntarily incorporated the rotational crop statement in its express warranty on the label. This express warranty states: "American Cyanamid warrants only that the material contained herein conforms to the chemical description on the label and is reasonably fit for the use therein described when used in accordance with the directions for use, subject to the risks referred to above." Because applying ASSERT in a grain crop that will be followed in rotation by a potato crop is a use described on the label and the label warrants that ASSERT is fit for this use, Cyanamid voluntarily assumed the warranty.

Therefore, considering the presumptions against preemption, the text and apparent congressional purpose of FIFRA, and EPA regulations, we conclude that Walker's express warranty claims do not impose any different or additional requirements for labeling.

### III.

### THE LIMITATION OF LIABILITY PROVISION IS UNCONSCIONABLE.

Cyanamid asserts that the trial court should not have ruled that the limitation of liability on the ASSERT product label is unconscionable, and, therefore unenforceable. We disagree.

I.C. § 28–2–719(3), a portion of the Uniform Commercial Code (UCC), provides:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

I.C. § 28–2–302 sets forth the procedure and standard courts are to use when addressing issues of unconscionability and provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

This Court has frequently considered the comments to the official text of the UCC and has given the comments substantial weight in determining the meaning of the statute. *E.g., Coeur d'Alene Mining Co. v. First Nat'l Bank*, 118 Idaho 812, 818, 800 P.2d 1026, 1032 (1990). Comment 1 to the official text of I.C. § 28–2–302 states, in part:

This section is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability. The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at

the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.

I.C. § 28–2–302, COMMENT 1 TO OFFICIAL TEXT (citations omitted).

■ Unconscionability has procedural and substantive components. Procedural unconscionability relates to the bargaining process leading to the agreement and is characterized by a "great disparity in the bargaining positions of the parties, by extreme need of one party to reach some agreement (however unfavorable), or by threats short of duress." *Smith v. Idaho State Univ. Fed. Credit Union,* 114 Idaho 680, 684, 760 P.2d 19, 23 (1988) (quoting *Hershey v. Simpson,* 111 Idaho 491, 494, 725 P.2d 196, 199 (Ct.App.1986)).

Substantive unconscionability focuses on the agreement itself and is a "narrow exception to the general principle that full force and effect must be given to a valid contract even though its provisions appear unwise or its enforcement may seem harsh." *Id.* "The elements of one-sidedness, *oppression* and *unfair surprise* are commonly cited in analyses of unconscionability." *Id.*

■ In making an unconscionability determination under I.C. § 28–2–302, the court must consider the purpose and effect of the clause at issue, the commercial setting in which the contract was executed, and the reasonableness of the clause at the time of contracting. *Clark v. Int'l Harvester Co.,* 99 Idaho 326, 345, 581 P.2d 784, 803 (1978). "Such determinations require the resolution of factual issues which the trial court must make in the first instance." *Id.* In reviewing an unconscionability determination, the Court in *Smith* stated the following standard of review:

> The appellate standard of review is well-established. Findings based on substantial and competent evidence will not be set aside. Moreover, "[o]n appeal this Court must view the evidence most favorably in support of the party who prevailed below."

114 Idaho at 684, 760 P.2d at 23.

■ In the present case, the trial court found that Cyanamid's representative advised Walker that ASSERT was safe for Walker's operation, Walker's course of conduct proceeded under this premise, and that although Walker's knowledge concerning ASSERT grew as time passed, Walker's assessment of the risks was influenced by Cyanamid's representations. Although the trial court did not make an explicit finding concerning Cyanamid's superior knowledge, it is implicit in the trial court's findings that Cyanamid had superior knowledge concerning the effects of ASSERT. There is substantial and competent evidence in the record to support these findings.

■ We reject Cyanamid's contention that the jury's rejection of Walker's fraud claims precludes a finding that Cyanamid had superior knowledge. The determination on unconscionability is made by the trial court, not the jury, and that determination is made by the trial court's assessment of the facts prior to the jury's consideration of the case. Therefore, the jury's verdict does not affect a trial court's ruling on unconscionability.

It is undisputed that Walker had no bargaining power concerning the limitation of liability. Cyanamid contends that Walker had some bargaining power because Walker obtained price considerations from the retail supplier.

Whether or not Walker had bargaining power with the supplier is not relevant to the relationship between Walker and Cyanamid. The relationship between Walker and Cyanamid is defined by the ASSERT label and the representations of Cyanamid's representative. There is no evidence that Walker had bargaining power concerning the limitation of liability on the label.

There is uncontradicted evidence that Walker had knowledge of the limitation. Walker's employees testified that it is their practice to read pesticide labels. The trial court found, however, that the limitation of liability provision is not understandable. The limitation states:

> Any damages arising from the breach of this warranty shall be limited to direct damages and shall not include consequential commercial damages such as loss of profits or values or any other special or indirect damages.

A contract provision is ambiguous if it is reasonably subject to conflicting interpretation and an ambiguous contract presents a question of fact regarding the parties' intent. *Doyle v. Ortega,* 125 Idaho 458, 461, 872 P.2d 721, 724 (1994). "It is well settled in Idaho that an ambiguous contract will be construed most strongly against the party who prepared the contract." *Jensen v. Seigel Mobile Homes Group,* 105 Idaho 189, 196, 668 P.2d 65, 72 (1983).

The limitation of liability provision specifically states that "direct damages" are recoverable. Black's Law Dictionary defines "direct damages" as those "such as follow immediately upon the act done. Damages which arise naturally or ordinarily from breach of contract; they are damages which, in ordinary course of human experience, can be expected to result from breach." BLACK'S LAW DICTIONARY 390 (6th ed.1990).

It is a reasonable interpretation that the damages that would naturally or ordinarily be expected to follow from the breach of the warranty in this case would be damages to the potatoes that were planted after grain to which ASSERT was applied. The ambiguity is created because "direct damages" can reasonably be interpreted to cover the value of the potatoes, but the phrase "shall not include consequential commercial damages" can reasonably be interpreted to preclude recovery of the value of the potatoes. Because the limitation of liability provision is reasonably subject to conflicting interpretation, it is ambiguous. This ambiguity affects the commercial setting, purpose, and effect of the provision and is an appropriate consideration in determining unconscionability under I.C. § 28-2-302.

The fact that Cyanamid had superior knowledge concerning ASSERT and made representations concerning its safety coupled with the fact that the label is ambiguous and with the lack of Walker's bargaining power to negotiate concerning the limitation of liability lead us to conclude that the limitation of liability provision is procedurally unconscionable.

Substantive unconscionability asks whether, at the time the contract was executed, and in light of the general background and commercial needs of a particular case, the clause is so one-sided as to oppress or unfairly surprise one of the parties. I.C. § 28-2-302(2); *Smith,* 114 Idaho at 684, 760 P.2d at 23.

The commercial setting, purpose, and effect of the clause are relevant in determining whether a contract is unconscionable. I.C. § 28-2-302(2). The risks contemplated by the parties at the time of the contract are relevant to the commercial setting, purpose, and effect of the parties. We conclude that it is this to which the trial court referred concerning the expectations of risk. It is clear that Walker contemplated there was a risk that ASSERT would harm the potato crops because Walker had discussions with Cyanamid representatives concerning this issue. The natural result of the breach of the warranty on the ASSERT label is damage to the potato crop. Therefore, it cannot be said that damage to the potato crop was not within Walker's contemplation.

The element of unfair surprise exists because of the ambiguity of the limitation of liability provision. A reasonable purchaser could interpret the provision not to limit the recovery of damages like those to Walker's potato crops.

Therefore, we conclude that the limitation of liability provision is substantively unconscionable because it constitutes unfair surprise.

## IV.

## WALKER'S PROOF OF CAUSATION AND DAMAGE CALCULATION ARE SUFFICIENT.

Cyanamid asserts that the trial court should not have allowed the jury to consider awarding damages to Walker because there was insufficient proof of causation and damage calculation. We disagree.

The issue of causation is usually a question of fact for the jury. *Garrett Freightlines, Inc. v. Bannock Paving Co.,* 112 Idaho 722, 726, 735 P.2d 1033, 1037 (1987). Causation becomes a question of law if the verdict is either: (1) not supported by substantial and competent evidence; or (2) against the clear weight of the evidence; "or, in other words, if upon its review of the

evidence in the record the reviewing court determines that reasonable minds could not differ concerning the issues of negligence or causation." *Id.*

■ Walker presented several expert witnesses who testified that Walker's crops suffered symptoms that were indicative of ASSERT damage. This evidence is sufficient to support the jury's finding that ASSERT was the proximate cause of Walker's damage.

Walker also presented accounting experts who testified that the yields were different from the multi-year average.

■ The measure of damages for crop loss is the difference between the value of the crop actually raised and the crop which would have been raised under normal conditions. *Thomas Helicopters, Inc. v. San Tan Ranches,* 102 Idaho 567, 572, 633 P.2d 1145, 1150 (1981); *Casey v. Nampa & Meridian Irr. Dist.,* 85 Idaho 299, 304, 379 P.2d 409, 411 (1963); *Kingsbury v. Bacon,* 38 Idaho 701, 703–04, 224 P. 438, 439 (1924). On Cyanamid's motion, the trial court did not allow Walker to present evidence concerning other farmers' yields and prices because it would be too complicated and burdensome.

Walker could not prove the yield and quality of its crops under normal conditions without a multi-year average. Thirty-nine of Walker's forty-five fields were damaged by ASSERT. The remaining six fields were not good comparisons. Two were "planted back to back" in potatoes; two were not fields normally farmed by Walker and did not have typical soil and nutritional make-up; and the remaining two fields were marginal land being farmed for the first time in 1990 and were not brought up to their productivity potential. Because Walker's fields were either affected by ASSERT or were not of comparable quality, Walker submitted evidence of yields through the use of a multi-year average, based on yield records from 1988 through 1992.

■ Cyanamid argues that the accounting experts' use of the multi-year average was insufficient to go to the jury under rule 702 of the Idaho Rules of Evidence (I.R.E.), which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

I.R.E. 702. Cyanamid does not argue that the accounting experts were not qualified as experts, nor does it argue that there was no foundation for their testimony. Cyanamid only argues that there is no evidence that the multi-year averages can be used reliably to represent the "normal year in question," citing the analysis set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court has stated that the appropriate test for measuring reliability of evidence in this state is I.R.E. 702. *State v. Gleason,* 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). The trial court has broad discretion in admitting expert evidence, and its judgment will only be disturbed on appeal when there has been a clear abuse of discretion. *Id.*

■ In *Nora v. Safeco Insurance Co.,* 99 Idaho 60, 62–63, 577 P.2d 347, 349–50 (1978), this Court ruled that evidence of the plaintiff's expected volumes of business and profit margins based on the plaintiff's previous years of experience and personal knowledge of the market was not too speculative to be inadmissible as proof of lost future earnings. In *Nora,* the plaintiff's expected business and profit volume was substantiated by previous years' business records and witnesses to the plaintiff's business and the market. *Id.* Similarly, Walker presented evidence of its expected yields through records of previous years' yields. Applying our usual three-step analysis to determine if the trial court abused its discretion in allowing this testimony, we conclude there was no abuse. *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

## V.

## THE TRIAL COURT CORRECTLY REDUCED WALKER'S DAMAGES BY THE AMOUNT OF CROP LOSS INSURANCE WALKER RECEIVED.

Walker asserts that the trial court should not have reduced the amount of damages

awarded by the jury by the amount Walker received from crop loss insurance. We disagree.

 In 1990, seed potatoes that Walker produced were rejected by the Idaho Crop Improvement Association's seed certification due to the presence of bacterial ring rot. Walker received a $782,248 insurance payment as compensation for the loss of certification for those potatoes. The jury awarded Walker $315,333 for seed loss caused by ASSERT, but the trial court applied I.C. § 6–1606 to reduce the jury's award by the same amount because of the crop insurance payment.

I.C. § 6–1606 provides:

In any action for personal injury or property damage, a judgment may be entered for the claimant only for damages which exceed amounts received by the claimant from collateral sources as compensation for the personal injury or property damage.... Evidence of payment by collateral sources is admissible to the court after the finder of fact has rendered an award. Such an award shall be reduced by the court to the extent the award includes compensation for damages which have been compensated independently from collateral sources.

Because this case involves no damages for personal injuries, the application of I.C. § 6–1606 here depends on whether the award of damages for seed loss was "property damage." "Property damage" as defined in the statute is "loss in value or in use of real or personal property, where such loss arises from physical damage to or destruction of such property." I.C. § 6–1601(8). Walker's potatoes were physically damaged. Therefore, under this definition the amount of crop insurance Walker received was for property damage.

Walker contends that the jury's award of $315,333 for "Seed Loss" also relates to commercial losses and that, therefore, it is impossible to determine what portion of the award was for seed loss. As we read the verdict, the $315,333 award is specifically for seed loss.

 Walker received $782,248 crop insurance for its seed loss. Walker paid $525,514 in insurance premiums. Walker contends that the reduction of the seed loss award can not exceed the net proceeds of $256,734. The trial court found that the seed certification insurance is a rider to a general policy, and it is not available without a general policy. The trial court also found that the premium for the seed certification coverage was $56,000. Based on these facts, the trial court correctly ruled that there was no justification for allowing Walker to offset the entire premium against the proceeds received because of the certification rider. The net proceeds of the insurance for purposes of the reduction is calculated by reducing the gross amount of insurance received, $782,248, by the amount of premiums for the seed certification provision, $56,000. This results in a $726,248 reduction limit. The reduction made by the trial court of $315,333 is within this limit.

## VI.

## WALKER IS ENTITLED TO ATTORNEY FEES UNDER I.C. § 12–120(3).

Cyanamid asserts that the trial court should not have awarded Walker attorney fees pursuant to I.C. § 12–120(3). We disagree.

 I.C. § 12–120(3) includes the provision that the prevailing party shall be allowed attorney fees in any action to recover in any "commercial transaction." "Commercial transaction" is defined to include "all transactions except transactions for personal or household purposes." I.C. § 12–120(3). This Court has adopted the following test to determine whether an award of attorney fees is warranted under the commercial transaction clause of I.C. § 12–120(3):

[T]he award of attorney's fees is not warranted every time a commercial transaction is remotely connected with the case. Rather, the test is whether the commercial transaction comprises the gravamen of the lawsuit. Attorney's fees are not appropriate under I.C. § 12–120(3) unless the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover.

*Brower v. E.I. DuPont De Nemours & Co.,* 117 Idaho 780, 784, 792 P.2d 345, 349 (1990).

In *Brooks v. Gigray Ranches, Inc.,* 128 Idaho 72, 78, 910 P.2d 744, 750 (1996), the Court restated the *Brower* test as follows:

> *Brower* establishes that there. are two stages to the analysis. First, there must be a commercial transaction that is integral to the claim. Second, the commercial transaction must be the basis upon which recovery is sought. In *Brower* there was a commercial element to the claim. However, the theory upon which recovery was sought was misrepresentation, a tort.

 In the present case, the express warranties given to Walker by Cyanamid were part of a commercial transaction— Walker's purchase of ASSERT. This commercial transaction was integral to Walker's express warranty claims and is the basis upon which we have upheld the award of damages to Walker. Therefore, Walker's claims for breach of the express warranty satisfy the "commercial transaction" requirement.

Because Walker has prevailed in this appeal, we also award Walker attorney fees on appeal pursuant to I.C. § 12–120(3). *Bott v. Idaho State Bldg. Auth.,* 122 Idaho 471, 481, 835 P.2d 1282, 1292 (1992).

## VII.

## CONCLUSION

Because we have upheld the award of damages to Walker based on the breach of express warranties, it is unnecessary for us to address the trial court's refusal to dismiss Walker's claim pursuant to the Idaho Consumer Protection Act and the trial court's dismissal of Walker's claims based on tort theories.

We affirm the judgment awarding Walker damages.

We affirm the trial court's decision to award Walker attorney fees. We award

Walker costs on appeal and attorney fees on appeal pursuant to I.C. § 12–120(3).

TROUT, C.J., and SILAK, SCHROEDER and WALTERS, JJ., concur.