**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 35839**

| | |
|---|---|
| DAVID OLIVER WHEELER,      ) | |
| ) | **2009 Opinion No. 70** |
| Petitioner-Appellant,   ) | |
| ) | **Filed: October 15, 2009** |
| v.   ) | |
| ) | **Stephen W. Kenyon, Clerk** |
| THE IDAHO TRANSPORTATION   ) | |
| DEPARTMENT, a governmental agency of  ) | |
| the State of Idaho,   ) | |
| ) | |
| Respondent.   ) | |
| ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. D. Duff McKee, District Judge.

Decision of the district court, affirming administrative order suspending driver's license after failing a blood alcohol concentration test, <u>affirmed</u>.

Vernon K. Smith, Jr., Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Michael J. Kane, Special Deputy Attorney General, Boise, for respondent. Michael J. Kane argued.

_____

PERRY, Judge Pro Tem

David Oliver Wheeler appeals from the district court's decision upon judicial review affirming the Idaho Transportation Department's order suspending Wheeler's driver's license for failing a blood alcohol concentration test. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

A police officer stopped Wheeler's vehicle after he observed it swerve across the center line and back into a turn lane. The officer also observed an odor of alcohol and that Wheeler had slurred speech, glassy eyes, and impaired memory. He admitted drinking an alcoholic beverage and failed several field sobriety tests, including a horizontal gaze nystagmus test, a walk-and-turn test, and the one-leg stand. Wheeler was arrested and transported to the police station where a blood alcohol concentration (BAC) test was administered. The test indicated Wheeler's BAC

1

was .197/.185. The officer seized Wheeler's driver's license, and he was issued a notice of suspension for failing an evidentiary test.

Wheeler requested a hearing to contest the administrative license suspension. During the telephonic hearing, he testified that he did not drive erratically and argued that the officer lacked probable cause to effectuate a stop of his vehicle. The hearing officer also considered an affidavit of the arresting officer, who was not the officer who observed Wheeler driving and stopped his vehicle. The affidavit repeated what the stopping officer had told the arresting officer about Wheeler's driving pattern. Wheeler also contended that the BAC test results were unreliable because the calibration solution had not been changed within the last 100 calibration checks in accordance with Idaho State Police Standard Operating Procedure (SOP) 2.2.1.1.2.1.[1] The hearing officer held that the officer had probable cause to stop Wheeler's vehicle and that SOP 2.2.1.1.2.1 recommended, but did not require, that the calibration solution "should be changed approximately every 100 calibration checks." Accordingly, the hearing officer concluded that proper procedures and standards were followed to ensure the reliability of the test result and sustained the suspension of Wheeler's driver's license. Wheeler appealed to the district court which affirmed the holding of the hearing officer. Wheeler again appeals.

## II.

### STANDARD OF REVIEW

The Idaho Administrative Procedures Act (IDAPA) governs the review of department decisions to deny, cancel, suspend, disqualify, revoke or restrict a person's driver's license. *See* I.C. §§ 49-201, 49-330, 67-5201(2), 67-5270. In an appeal from the decision of the district court acting in its appellate capacity under IDAPA, this Court reviews the agency record independently of the district court's decision. *Marshall v. Idaho Dep't of Transp.,* 137 Idaho 337, 340, 48 P.3d 666, 669 (Ct. App. 2002). This Court does not substitute its judgment for that of the agency as to the weight of the evidence presented. I.C. § 67-5279(1); *Marshall,* 137 Idaho

---

[1] The Idaho State Police has been given the responsibility to promulgate regulations for administration of breath alcohol tests, I.C. §§ 18-8002A(3), 18-8004(4); IDAHO ADMINISTRATIVE PROCEDURES ACT 11.03.01.013.03, and has done so through creation of standard operating procedures and training manuals for the use of breath test instruments, including the Intoxilyzer 5000. *See* IDAHO STATE POLICE, STANDARD OPERATING PROCEDURE: BREATH ALCOHOL TESTING (Rev. Nov. 2006); IDAHO STATE POLICE, INTOXILYZER 5000: OPERATOR'S TRAINING MANUAL (Rev. March 2007).

2

at 340, 48 P.3d at 669.  This Court instead defers to the agency's findings of fact unless they are clearly erroneous.  *Castaneda v. Brighton Corp.,* 130 Idaho 923, 926, 950 P.2d 1262, 1265 (1998); *Marshall,* 137 Idaho at 340, 48 P.3d at 669.  In other words, the agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record.  *Urrutia v. Blaine County, ex rel. Bd. of Comm's,* 134 Idaho 353, 357, 2 P.3d 738, 742 (2000); *Marshall,* 137 Idaho at 340, 48 P.3d at 669.

A court may overturn an agency's decision where its findings, inferences, conclusions, or decisions:  (a) violate statutory or constitutional provisions;  (b) exceed the agency's statutory authority;  (c) are made upon unlawful procedure;  (d) are not supported by substantial evidence in the record; or (e) are arbitrary, capricious, or an abuse of discretion.  I.C. § 67-5279(3).  The party challenging the agency decision must demonstrate that the agency erred in a manner specified in I.C. § 67-5279(3) and that a substantial right of that party has been prejudiced.  *Price v. Payette County Bd. of County Comm'rs*, 131 Idaho 426, 429, 958 P.2d 583, 586 (1998); *Marshall,* 137 Idaho at 340, 48 P.3d at 669.  If the agency's decision is not affirmed on appeal, "it shall be set aside . . . and remanded for further proceedings as necessary."  I.C. § 67-5279(3).

### III.

### ANALYSIS

The administrative license suspension statute, I.C. § 18-8002A, requires that the Idaho Transportation Department (ITD) suspend the driver's license of a driver who has failed a BAC test administered by a law enforcement officer.  The period of suspension is ninety days for a driver's first failure of an evidentiary test and one year for any subsequent test failure within five years.  I.C. § 18-8002A(4)(a).  A person who has been notified of such an administrative license suspension may request a hearing before a hearing officer designated by the ITD to contest the suspension.  I.C. § 18-8002A(7).  At the administrative hearing, the burden of proof rests upon the driver to prove any of the grounds to vacate the suspension.  I.C. § 18-8002A(7); *Kane v. State, Dep't of Transp.*, 139 Idaho 586, 590, 83 P.3d 130, 134 (Ct. App. 2003).  The hearing officer must uphold the suspension unless he or she finds, by a preponderance of the evidence, that the driver has shown one of several grounds enumerated in I.C. § 18-8002A(7) for vacating the suspension.  Those grounds include:

> (a)  The peace officer did not have legal cause to stop the person; or

3

(b) The officer did not have legal cause to believe the person had been driving or was in actual physical control of a vehicle while under the influence of alcohol, drugs or other intoxicating substances in violation of the provisions of section 18-8004, 18-8004C or 18-8006, Idaho Code; or

(c) The test results did not show an alcohol concentration or the presence of drugs or other intoxicating substances in violation of section 18-8004, 18-8004C or 18-8006, Idaho Code; or

(d) The tests for alcohol concentration, drugs or other intoxicating substances administered at the direction of the peace officer were not conducted in accordance with the requirements of section 18-8004(4), Idaho Code, or the testing equipment was not functioning properly when the test was administered . . . .

The hearing officer's decision is subject to challenge through a petition for judicial review. I.C. § 18-8002A(8); *Kane*, 139 Idaho at 589, 83 P.3d at 133.

## A.    Legal Cause

Wheeler argues that the evidence did not support a finding of legal cause to stop him. We note initially that it was Wheeler's burden to present evidence affirmatively showing that the officer lacked legal cause to stop Wheeler's vehicle. A traffic stop by an officer constitutes a seizure of the vehicle's occupants and implicates the Fourth Amendment's prohibition against unreasonable searches and seizures. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). Under the Fourth Amendment, an officer may stop a vehicle to investigate possible criminal behavior if there is a reasonable and articulable suspicion that the vehicle is being driven contrary to traffic laws. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *State v. Flowers*, 131 Idaho 205, 208, 953 P.2d 645, 648 (Ct. App. 1998). The reasonableness of the suspicion must be evaluated upon the totality of the circumstances at the time of the stop. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999). The reasonable suspicion standard requires less than probable cause but more than mere speculation or instinct on the part of the officer. *Id.* An officer may draw reasonable inferences from the facts in his or her possession, and those inferences may be drawn from the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988). Suspicion will not be found to be justified if the conduct observed by the officer fell within the broad range of what can be described as normal driving behavior. *Atkinson*, 128 Idaho at 561, 916 P.2d at 1286.

4

Wheeler argues that the only evidence presented before the hearing officer was his live testimony that he did not drive erratically and the arresting officer's affidavit reporting observations made by a different officer who stopped Wheeler's vehicle. Wheeler contends that the officer's statements reporting the other officer's observations were improperly considered because they were inadmissible hearsay. Idaho Code Section 18-8002A(7) provides that a hearing officer may consider the sworn statement of the arresting officer which "shall be admissible at the hearing without further evidentiary foundation." Additionally, IDAPA gives presiding officers at administrative hearings the discretion to exclude certain types of evidence and provides that "all other evidence may be admitted if it is of a type commonly relied upon by prudent persons in the conduct of their affairs." I.C. § 67-5251(1). A hearing officer is not bound by the Idaho Rules of Evidence. IDAPA 04.11.01.600. Accordingly, the hearing officer was not prohibited from considering hearsay evidence in its consideration of legal cause to stop Wheeler's vehicle. Furthermore, an officer may rely on information supplied by other officers, and "the collective knowledge of police officers involved in the investigation--including dispatch personnel--may support a finding of probable cause." *State v. Carr*, 123 Idaho 127, 130, 844 P.2d 1377, 1380 (Ct. App. 1992). Therefore, the hearing officer did not err by considering the arresting officer's sworn statement relating the visual observations justifying the stop of Wheeler's vehicle on the suspicion of DUI made by the officer who pulled him over.

Wheeler argues that the officers were required to testify at the administrative hearing and that the hearing officer erred by proceeding with only the arresting officer's sworn affidavit containing hearsay. The arresting officer is not required to participate in an administrative hearing on the suspension of a driver's license unless subpoenaed by the hearing officer. I.C. § 18-8002A(7). A person challenging an administrative license suspension may request a subpoena from the hearing officer requiring the attendance of a witness. IDAPA 39.02.72.300. Wheeler did not do so. Therefore, we do not further address this argument.

Wheeler argues that the hearing officer erred by holding the hearing by telephone rather than in person. Idaho Code Section 18-8002A(7) provides that "the department may conduct all hearings by telephone if each participant in the hearing has an opportunity to participate in the entire proceeding while it is taking place." As noted above, the officers were not required to be present and Wheeler did not subpoena them. All participants in the hearing had an opportunity to participate fully in the proceeding. Wheeler testified that he did not drive erratically. The

officer's affidavit stated that Wheeler was observed driving erratically. We have already concluded that the affidavit was properly considered. Therefore, nothing further would have been achieved by holding the hearing in person. Accordingly, the hearing officer did not err by holding the hearing by telephone.

Wheeler raises other issues that are meritless and unsupported by adequate argument or authority. A party waives an issue on appeal if either argument or authority is lacking. *Powell v. Sellers*, 130 Idaho 122, 128, 937 P.2d 434, 440 (Ct. App. 1997). Accordingly, we do not address them further.

**B.      Calibration Solution**

Wheeler argues that the results of his BAC test were unreliable and inadmissible because the calibration solution for the Intoxilyzer 5000 was not changed within approximately 100 calibration checks as required by SOP 2.2.1.1.2.1. This rule provides: "The 0.08 solution should be changed approximately every 100 calibration checks or every month whichever comes first." Both the hearing officer and the district court held that this language was not mandatory and that Wheeler's test result, which was the 117th test conducted without changing the solution, was reliable and admissible.

The interpretation of a statute is an issue of law over which we exercise free review. *Zener v. Velde*, 135 Idaho 352, 355, 17 P.3d 296, 299 (Ct. App. 2000). Administrative regulations are subject to the same principles of statutory construction as statutes. *Mason v. Donnelly Club*, 135 Idaho 581, 586, 21 P.3d 903, 908 (2001). When interpreting a statute or rule, we will construe the statute as a whole to give effect to the intent of the legislature or promulgating entity. *See George W. Watkins Family v. Messenger*, 118 Idaho 537, 539-40, 797 P.2d 1385, 1387-88 (1990); *Zener*, 135 Idaho at 355, 17 P.3d at 299. Interpretation of such a rule should begin, therefore, with an examination of the literal words of the rule. *Mason*, 135 Idaho at 586, 21 P.3d at 908. The language of the rule, like the language of a statute, should be given its plain, obvious and rational meaning. *Id.* In addition, this language should be construed in the context of the rule and statute as a whole, to give effect to the rule and to the statutory language the rule is meant to supplement. *Id.* When an ambiguous rule is part of a larger scheme, we focus not only upon the language of the ambiguous rule, but also look at other rules relating to the same subject matter and consider them together to discern the promulgator's intent. *See State v. Shanks*, 139 Idaho 152, 154, 75 P.3d 206, 208 (Ct. App. 2003).

6

In this case, we must interpret the meaning of the SOP directing that the calibration solution *should* be changed approximately every 100 checks or every month, whichever is sooner. The hearing officer and the district court agreed that the word "should" was not mandatory and that deviation from the standard did not automatically render the test result inadmissible. Wheeler argues that the word "should" is mandatory and that any deviation results in a per se invalidation of the test. However, this reading of the regulation is not in harmony with its plain language. Furthermore, even if the language was ambiguous, such a reading is not in harmony with the intent of the promulgating party nor with the surrounding rules of similar subject matter read together as part of a larger regulatory scheme.

The Idaho Supreme Court has held that the word "may" is a permissive term expressing a right of discretion, whereas, the words "must" or "shall" are mandatory. *Rife v. Long*, 127 Idaho 841, 848, 908 P.2d 143, 150 (1995). The Court has recently analyzed an Idaho Division of Highways regulation directing that single-approach driveways *should* intersect as closely as possible at right angles to the roadway. *Neighbors for a Healthy Gold Fork v. Valley County*, 145 Idaho 121, 134, 176 P.3d 126, 139 (2007). The Court held that, "although approaches *should* intersect as closely as possible to right angles, this language is not mandatory." *Neighbors*, 145 Idaho at 134, 176 P.3d at 139. Likewise, we conclude that "should" is not a mandatory term. The word "should" is properly interpreted as an advisory term or strong recommendation. This does not, however, end our inquiry.

We next must determine what result follows from the violation of an SOP providing that certain procedures should be followed. This Court has previously held that a violation of a mandatory provision, such as the 15-minute waiting period, requires a hearing officer to vacate a driver's license suspension.[2] *In re Suspension of Driver's License of Gibbar*, 143 Idaho 937,

---

[2]     SOP 3.1 provides:

>     Prior to evidential breath alcohol testing, the subject *must* be monitored for fifteen (15) minutes. . . .
>         . . . .
>     3.1.4   During the waiting period, the monitor *must* be alert for any event that might influence the accuracy of the breath test.
>             3.1.4.1 If, during the 15-minute waiting period, the subject vomits or is otherwise suspected of regurgitating material from the stomach, the 15-minute waiting period *must* begin again.

944, 155 P.3d 1176, 1183 (Ct. App. 2006). When a driver requests a hearing on the suspension of his or her driver's license, he or she must prove by a preponderance of the evidence one of the grounds listed in I.C. § 18-8002A(7), including that the evidentiary test was not conducted in accordance with applicable standards of procedure. In the case of mandatory regulations, directing that a procedure "must" or "shall" be followed, the driver meets that burden by showing only that the procedure was not followed. In that event, the test results are inadmissible per se. The SOPs contain many such mandatory provisions.[3] However, the SOPs also contain many provisions directing that a procedure "should" be followed.[4] To read "should" as meaning

---

> 3.1.4.2 The operator *must* be aware of the possible presence of mouth alcohol as indicated by the testing instrument.
> 3.1.4.3 If mouth alcohol is suspected or indicated, the operator *must* begin another 15-minute waiting period before repeating the testing sequence.

(Emphasis added).

[3]     *See, e.g.*, SOP 1 (providing that individual breath testing instruments, operators, and breath testing specialists [BTS] must be approved by the Idaho State Police Forensic Services); SOP 1.2.1.1 and 2.1.1 (providing that a valid calibration check must be performed within twenty-four hours of a breath test for Alco-Sensor instruments); SOP 1.2.1.2 and 2.2.2 (providing that a valid calibration check must be performed with every breath test for Intoxilyzer 5000 instruments); SOP 1.3.1.1 (requiring that an individual that fails to complete a certification class must retake the operator class in order to become certified); SOP 1.3.2 (providing that upon expiration of certification, an operator must retrain by attending the operator class); SOP 1.4.1 (providing that to obtain initial BTS certification, an individual must be currently certified as an operator of that particular instrument); SOP 1.5.1.1 (providing that any new instrument must utilize the same type of technology as the instrument for which the BTS holds current certification); SOP 1.5.1.1.1 (providing that if the operation of a new instrument is different, the BTS must complete an operator changeover class); SOP 2.1.3 (providing that calibration checks for Alco-Sensor units must give results falling within an acceptable range); SOP 2.1.4.1.2 (providing that a 0.20 simulator solution must be run, and results logged each time the 0.08 solution lot number is changed or once per calendar month at a minimum); SOP 2.2.1.1.2.2 (providing that a simulator port calibration check must be run whenever the Intoxilyzer 5000 0.08 solution is changed); SOP 2.2.4.1 (providing that the simulator temperature of the Intoxilyzer 5000 must be checked prior to testing); SOP 3.1 (providing mandatory procedures for the 15-minute waiting period).

[4]     *See, e.g.*, SOP 2.1.2.1 and 2.2.4 (providing that the simulator temperature for Alco-Sensor  and Intoxilyzer 5000 calibration checks should be between 33.5°C and 34.5°C); SOP

"must" would eliminate any purpose to the semantic distinction drawn by the Idaho State Police (ISP) when the regulations were promulgated. We are not persuaded that the ISP meant for such a distinction to be meaningless and illusory.

In order to give due credit to the promulgating party's intent in repeatedly choosing to use the word "should" instead of "must" or "shall," and vice versa, we conclude that the violation of a regulation requiring that a procedure "should" be followed does not render a test result inadmissible per se. Rather, in such case, the violation opens the door for the driver to attack the evidentiary test result through expert testimony or other evidence tending to prove that the violation rendered the result unreliable. This is best accomplished on a case-by-case basis.

In this case, Wheeler presented no evidence before the hearing officer that his test was unreliable except that the calibration check was the 117th check done on that particular Intoxilyzer 5000 unit. More is required than a mere assertion that the test was unreliable. Pure speculation that failure to change the sample solution precisely at the earlier of 100 tests or thirty days affected the results of a particular test does not meet the driver's burden of proof. In the absence of admissible evidence to the contrary, we will not interpret "should" as "must" to imply a contaminated result. Therefore, Wheeler has failed to meet his burden of proving by a

_____

2.1.2.1.1 (providing that the operator should check simulator temperature prior to the calibration check); SOP 2.1.2.2.1.1 (providing that after three unsatisfactory calibration check runs, an Alco-Sensor unit should not be used until the problem is corrected); SOP 2.1.4 and 2.2.1.1.1 (providing that calibration solutions for Alco-Sensor units and Intoxilyzer 5000 units should only be used prior to expiration date on the label); SOP 2.1.4.1.1 (providing that calibration solutions for Alco-Sensor units should be changed approximately every 15-20 calibration checks or every month whichever comes first); SOP 2.2.1.1.2 (providing that calibration solutions for Intoxilyzer 5000 should only be used as long as they produce values in an acceptable range); SOP 2.2.1.1.2.1 (providing that the solution for Intoxilyzer 5000 should be changed approximately every 100 calibration checks or every month whichever comes first); SOP 2.2.3.1 (providing that calibration check information for Intoxilyzer 5000 should be entered into instrument log); SOP 3.1.1 (providing that the monitor during the 15-minute waiting period should be a certified breath test operator); SOP 3.2.2.2 (providing that a new mouthpiece should be used for each repeat test sequence as required by the circumstances); SOP 3.2.3.2 (providing that the operator should log test results and retain printouts for possible use in court); SOP 3.2.3.3.1 (providing that when a subject fails or refuses to provide a second or third sample, the operator should note the circumstances in his report); SOP 3.2.3.3.2 (providing that if second or third samples are lacking due to instrument failure, the operator should attempt to utilize another instrument or have blood drawn); SOP 3.2.3.2.3 (providing that with repeat samples, the operator should log all test results, including refusals, and retain all printouts).

preponderance of the evidence that his evidentiary test was not conducted in accordance with applicable regulations or that the Intoxilyzer 5000 unit was not functioning properly. Accordingly, the hearing officer and the district court did not err by relying on the evidentiary test results in this case.

## C.    Attorney Fees

Wheeler argues that he is entitled to attorney fees pursuant to I.C. § 12-117.  That section provides:

> (1)    Unless otherwise provided by statute, in any administrative or civil judicial proceeding involving as adverse parties a state agency, a city, a county or other taxing district and a person, the court shall award the prevailing party reasonable attorney's fees, witness fees and reasonable expenses, if the court finds that the party against whom the judgment is rendered acted without a reasonable basis in fact or law.

Wheeler has not prevailed on appeal.  Therefore, he is not entitled to attorney fees under I.C. § 12-117.

## IV.

## CONCLUSION

The police officer had legal cause to stop Wheeler's vehicle.  The hearing officer did not err by holding the hearing by telephone and without the officers present.  Additionally, the hearing officer did not err by considering the sworn affidavit of the arresting officer containing the hearsay observations of the officer who stopped Wheeler's vehicle.  The SOP directing when the Intoxilyzer 5000 calibration solution should be changed is not mandatory, and Wheeler did not present any evidence why his test result was otherwise unreliable.  Therefore, Wheeler failed to show by a preponderance of the evidence that the hearing officer should not have upheld the suspension of his driver's license for failure of an evidentiary test.  Accordingly, the district court's decision upon judicial review affirming the Idaho Transportation Department's order suspending Wheeler's driver's license for failing a blood alcohol concentration test is affirmed. Costs, but not attorney fees, are awarded to the respondent, Idaho Transportation Department.

Judge GRATTON, **CONCURS.**

10

Judge LANSING, **DISSENTING**

I concur with Part III(A) of the majority opinion, but I respectfully dissent from Part III(B). In my view, the district court's decision should be reversed, and the suspension of Wheeler's driver's license should be vacated, because he met his burden to prove that his breath alcohol test was not administered in compliance with governing standards.

It is helpful to begin with a brief review of the development of the statutory law concerning testing of drivers for alcohol concentration in the breath, blood or urine. In 1972, when the DUI statutes were codified in Title 49 of the Idaho Code, the legislature added the following provision to I.C. § 49-1102: "Chemical analysis of blood, urine or breath for the purpose of determining the blood alcohol level shall be performed by a laboratory operated by the Idaho department of health or by a laboratory approved by the Idaho department of health under the provisions of approval and certification standards to be set by that department." 1972 Idaho Sess. Laws, ch. 155, § 1 at 342. The stated purpose of the amendment was to "provide for better uniformity and accuracy" in testing. Statement of Purpose, HB 580 (RS 3616) (1972). The DUI statutes were later recodified into Title 18, and in 1987, the legislature added the following provision to I.C. § 18-8004(4):

> Notwithstanding any other provision of law or rule of court, the results of any test for alcohol concentration and records relating to calibration, approval, certification or quality control performed by a laboratory operated or approved by the Idaho department of health and welfare or by any other method approved by health and welfare shall be admissible in any proceeding in this state without the necessity of producing a witness to establish the reliability of the testing procedure for examination.

1987 Idaho Sess. Laws, ch. 122, § 2 at 247, 249-50. The legislative purpose of this provision making the test results admissible in judicial proceedings without witness testimony concerning the reliability of the testing equipment and procedure was, in part, to "make the practice uniform around the state . . . and to avoid the 'economic burden to the state to have to furnish witnesses to provide superfluous verification.'" Statement of Purpose, HB 284 (RS13389) (1987). Subsequently, the responsibility for setting testing standards for laboratories and other test methods was shifted to the Department of Law Enforcement, 1988 Idaho Sess. Laws, ch. 47, § 4 at 54, 65, which was later renamed the Idaho State Police (ISP). 2000 Idaho Sess. Laws, ch. 469, § 1 at 1450, 1456.

11

As the legislative statements of purpose indicate, this statutory scheme is intended to streamline trials and reduce the costs of prosecution while at the same time assuring the accuracy of the tests. It can meet this objective and can accord with due process and demands of fundamental fairness only if there actually exist promulgated standards for administration of BAC tests that ensure accurate and reliable test results. In other words, the *quid pro quo* for the convenience and economy of admitting test results pursuant to I.C. § 18-8004(4) is that the ISP must promulgate ascertainable standards that, if complied with, will yield accurate BAC testing.

If a driver fails a breath test that was administered in conformity with ISP standards, significant consequences follow for the driver, quite apart from any prosecution for driving under the influence. The individual's driver's license is immediately seized by a law enforcement officer and the driver will be given a notice of suspension and a temporary driving permit. I.C. § 18-8002A(5)(a). If no hearing is requested, the driver's license will be suspended by the Idaho Transportation Department for a period of 90 days for the first failure of an evidentiary test and for a period of one year for a second and any subsequent failure of an evidentiary test within a five-year period. I.C. § 18-8002A(4).[5] The driver has a right to request a hearing within seven days of the notice of suspension. I.C. § 18-8002A(7). If a hearing is requested, the burden will be upon the driver to show cause why the license should not be suspended. I.C. § 18-8002A(7). A driver may do this by showing, among other things, that the BAC test administered by the officer was "not conducted in accordance with the requirements of § 18-8004(4)." I.C. § 18-8002A(7). The hearing will be an informal proceeding before a hearing officer designated by the Idaho Transportation Department, I.C. § 8002A(7). Because this administrative hearing is not a criminal or judicial proceeding, the constitutional protections afforded to one charged with a crime do not apply--there is no right to appointed counsel for the indigent nor any right to confront adverse witnesses. In addition, the rules of evidence that govern judicial proceedings do not apply, I.C. § 67-5251, I.R.E. 101(b), and the burden of proof rests on the driver rather than on the State. I.C. § 18-8002A(7).

The ISP has not formally promulgated administrative rules prescribing testing equipment or requirements for its maintenance and operation. Instead, the ISP has announced its approved breath testing methods through standard operating procedures manuals and training manuals

---

[5]    Restricted driving privileges may be allowed after a first test failure. I.C. § 18-8002A(4).

describing how to use approved breath test instruments, including the Intoxilyzer 5000. *See* I.D.A.P.A. 11.03.01.013.03.[6] As to the Intoxilyzer 5000 that is at issue here, the standards are found in the Standard Operating Procedures Manual (SOP). This Court has treated such documents as "rules" for purposes of judicial review because they constitute the only materials by which the ISP has acted upon the I.C. § 18-8002A(3) authorization for the ISP to "prescribe by rule" approved testing instruments and methods. *See*, *e.g.*, *In re Schroeder*, 147 Idaho 476, 479 n.3, 210 P.3d 584, 587 n.3 (Ct. App. 2009); *Archer v. State, Dep't of Transportation*, 145 Idaho 617, 620-21, 181 P.3d 543, 546-47 (Ct. App. 2008); *State v. DeFranco*, 143 Idaho 335, 337, 144 P.3d 40, 42 (Ct. App. 2006).

One of the ISP standards for maintenance and operation of the Intoxilyzer 5000, and the one at issue here, is expressed in SOP 2.2.1.1.2.1, which states, "The 0.08 solution should be changed approximately every 100 calibration checks or every month whichever comes first." The referenced 0.08 solution is a solution that is used to calibrate the Intoxilyzer 5000 instrument to ensure that it will accurately measure a test subject's breath alcohol content. The point of contention here is the meaning of the word "should" in this directive.

The majority holds that the word is recommendatory, not mandatory. While I agree that "should" in many contexts connotes only a recommendation, not a requirement, its interpretation must depend upon the context and the purpose of the provision in which the word appears. In my view, the majority's interpretation that "should" as used in the SOP denotes only actions that are recommended but not mandatory--and hence are optional--is not a reasonable interpretation of the ISP's intent and is not consistent with other sections of the SOP which make it plain that proper calibration is essential to the accurate functioning of the Intoxilyzer 5000. These other sections include SOP 1.2, which states, "Each approved breath-testing instrument is approved or disapproved for evidentiary testing based on the results of calibration checks performed as described in Section II." SOP 1.2.1.2 states that for an Intoxilyzer 5000, "a valid calibration check must be performed with every breath test." SOP 1.2.2 provides "if a calibration check produces results outside the acceptable range of values, the instrument may not be approved for

---

[6]     This administrative regulation promulgated by the Idaho State Police states:
        "Breath tests shall be administered in conformity with standards established by the department. Standards shall be developed for each type of breath testing instrument used in Idaho, and such standards shall be issued in the form of standard operating procedures and training manuals."

13

evidentiary use for breath tests associated with that calibration check." By these provisions, the ISP has plainly acknowledged that proper calibration, with a properly constituted calibration solution, is necessary to insure accurate test results. Hence, there is a clear recognition and intent that *some* standards are required for such calibration and calibration solutions.

But a "standard" that is merely a recommendation, and hence optional, is no standard at all--it is merely something that the officers maintaining and operating the Intoxilyzer 5000 may do if they wish or may disregard. As noted in footnote 4 of the majority opinion, the SOP uses the word "should" numerous times throughout the provisions governing use of the Intoxilyzer 5000 and another type of equipment, the Alco-Sensor. If this word conveys only a recommendation and not a requirement, then despite the acknowledgement in the SOP that proper calibration is essential for the accurate operation of the instrument, the ISP has adopted *no* actual ascertainable standard for the frequency with which the calibration solution must be changed for either the Intoxilyzer 5000 or the Alco-Sensor (SOP 2.1.4.1.1 and 2.2.1.1.2.1), for the simulator temperature for calibration checks of either the Intoxilyzer 5000 or the Alco-Sensor (SOP 2.1.2.1 and 2.2.4), for whether the operator need check the temperature before conducting a calibration check (SOP 2.1.2.1.1), for whether or when the Alco-Sensor must be taken out of service after unsatisfactory calibration check runs (SOP 2.1.2.2.1.1), for whether calibration solutions for the Alco-Sensor and the Intoxilyzer 5000 may be used after the expiration date on the label, or, if so, for how long thereafter (SOP 2.1.4 and 2.2.1.1.1), for whether calibration solutions for the Intoxilyzer 5000 may be used when they do not produce values in an acceptable range (SOP 2.2.1.1.2), for whether the calibration check information must be entered into an instrument log (SOP 2.2.3.1), for whether the person monitoring the subject during the fifteen-minute waiting period before administration of the breath test must be a certified breath test operator (SOP 3.1.1), and for whether a new mouthpiece need be used for repeat tests (SOP 3.2.2.2). In other words, if "should" means "optional," then the ISP's "standards" for use of the Intoxilyzer 5000 are full of gaping holes--and seeming contradictions between the obvious acknowledgement that proper calibration is necessary for reliable test results and the utter absence of any defined standards for conducting such calibrations. The majority opines that to interpret "should" as meaning "must" would render the distinction between the two words "meaningless and illusory." I respectfully respond that to interpret the word "should" in this circumstance as merely recommendatory and optional, renders "meaningless and illusory" every

14

provision of the SOP in which that word is used. This could not possibly comply with the ISP's statutory responsibility to prescribe "requirements" for evidentiary testing and calibration of testing equipment under I.C. §§ 18-8002A(3) and 18-8004(4). And if there are no adequately defined requirements, then the Intoxilyzer 5000 breath tests results are not admissible under I.C. § 18-8004(4) because there is then no defined "method" approved by the ISP.

This result, however, is obviously not what is intended by the ISP. The ISP clearly did intend to promulgate standards, not just make optional, take-or-leave suggestions for how an Intoxilyzer 5000 could be maintained and operated. The intent of the ISP can be effectuated, the validity of the standards salvaged, and the admissibility of BAC test results secured, by the reasonable interpretation that the ISP used the word "should" in the SOP as mandatory, introducing requirements that must be followed.

I would also point out that the majority's solution of placing the burden on the driver to retain an expert witness to testify at the administrative hearing about the effect on the accuracy of the BAC test when an operator does not follow the "should" provisions of the SOP is not consistent with the statute that we are applying. I.C. § 18-8002A(7) imposes no such burden upon the driver. It provides that a driver's license suspension must be vacated if the driver demonstrates at the administrative hearing that the test for alcohol concentration was "not conducted in accordance with the requirements of § 18-8004(4), Idaho Code," i.e., when the tests were not administered in compliance with standards promulgated by the ISP. This statute presupposes that some "requirements" will have been promulgated, as the ISP is charged with doing. If there are no such requirements for calibration of the Intoxilyzer 5000, as the majority opinion seems to hold, even though calibration is plainly required for its accuracy, then Wheeler's BAC test was not conducted in compliance with the requirements of I.C. § 18-8004(4) because the ISP has not fulfilled its obligations thereunder. However, as explained above, that is not an interpretation that I espouse.

In my view, the SOP was intended to, and does, set standards requiring compliance by Intoxilyzer 5000 operators. The more reasonable interpretation is that the requirement that the calibration solution "should be changed approximately every 100 calibration checks or every month whichever comes first" is mandatory. I would also hold that 117 is not "approximately

15

100."[7]  Therefore, Wheeler has demonstrated that his BAC test was not administered in compliance with the requirements of I.C. § 18-8004(4), and it follows that the suspension of his driver's license must be vacated pursuant to I.C. § 18-8002A(7)(d).

Accordingly, I would reverse the decision of the district court.

---

[7]  There is no need here to go into an analysis of the propriety of using the term "approximately" in a rule that is supposed to be setting defined standards, but the problems caused by its use are as obvious as the problems caused by the use of "should."