**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39874**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2013 Opinion No. 39** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: June 21, 2013** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| GEORGE JOSEPH BESAW, JR., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Jeff M. Brudie, District Judge; Hon. Jay Gaskill, Magistrate.

District court decision affirming judgment of conviction for driving under the influence, <u>affirmed</u>.

Clark and Feeney, Lewiston, for appellant. Charles M. Stroschein argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. John C. McKinney argued.

---

LANSING, Judge

George Joseph Besaw, Jr. appeals from his conviction of misdemeanor driving under the influence with an excessive alcohol concentration of .20 or above. Besaw contends that the magistrate court erred in its pretrial rulings concerning the admissibility of field sobriety tests and the breath alcohol concentration test. We affirm.

**I.**

**BACKGROUND**

In the early morning hours of January 16, 2011, an Idaho State Police trooper stopped a vehicle driven by Besaw for failing to signal and failing to maintain its lane of travel. As the trooper spoke with Besaw, he detected the odor of an alcoholic beverage coming from the vehicle and observed that Besaw's eyes were bloodshot. The trooper conducted sobriety tests and concluded that Besaw was intoxicated. Besaw was arrested for driving under the influence,

1

and the trooper administered a breath alcohol concentration (BAC) test on a portable device, the Lifeloc-FC20. The test results indicated breath alcohol concentrations of .219 and .201.

Besaw was charged with misdemeanor driving under the influence with an excessive alcohol concentration of .20 or above, Idaho Code §§ 18-8004(1)(a), -8004C(1). On a pretrial motion, Besaw sought to preclude the prosecution from presenting evidence of the field sobriety tests and the results of the BAC test. Following a hearing at which the trooper testified, the magistrate court specified what evidence it would allow at trial regarding the field sobriety tests and denied the remainder of the motion. Besaw was convicted after a jury trial. He appealed to the district court, asserting error in the denial of his motions to exclude the field sobriety tests and breath test from evidence. The district court affirmed and this appeal followed.

## II.

## STANDARD OF REVIEW

On review of a decision of the district court, rendered in its appellate capacity, we examine the magistrate division record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008).

## III.

## ANALYSIS

### A.    The Field Sobriety Tests

Three field sobriety tests were administered to Besaw: a horizontal gaze nystagmus or "HGN" test, a one-leg stand test, and a walk-and-turn test. By his pretrial motion concerning the admissibility of the tests, Besaw sought:

> to prohibit the introduction of any field sobriety tests until the State lays a proper foundation to show: that such tests are reliable in establishing the effects of alcohol on the human body; that the tests were conducted in the correct fashion; that said tests were approved by the proper governmental agency. Defendant requests a *Parkinson* or I.R.E., Rule 702 hearing.

In his argument to the magistrate court, Besaw contended that Idaho appellate courts had not decided the admissibility of field sobriety test evidence under Idaho Rule of Evidence 702[1] and

---

[1]    Idaho Rule of Evidence 702 states:

2

that a further "Rule 702 hearing" was required at which the State would have to establish the reliability of such evidence before the trooper's expert testimony concerning the same should be allowed.

The magistrate court disagreed. Based upon two Idaho Supreme Court opinions, *State v. Garrett*, 119 Idaho 878, 811 P.2d 488 (1991), and *State v. Gleason*, 123 Idaho 62, 844 P.2d 691 (1992), the court concluded that the Idaho Supreme Court had already decided that with a proper foundation showing the tester's expertise in conducting the test, HGN evidence was reliable and admissible under I.R.E. 702, but that permissible expert opinion on the matter was confined to certain limited inferences. Accordingly, the magistrate court limited the trooper's testimony to a conclusion that nystagmus, along with Besaw's performance on other field sobriety tests, *may* be an indicator of intoxication and an opinion as to whether Besaw was intoxicated. With regard to the two remaining field sobriety tests--a one-leg stand test and a walk-and-turn test--the magistrate held that Rule 702 was not implicated because the tests were not scientific.

### 1.     HGN test

Besaw first asserts that the trooper's testimony about the HGN test ought not to have been admitted without further foundation to establish the reliability of that test as an indicator of intoxication. An explanation of his argument must begin with the Idaho Supreme Court's decision in *Garrett*. There the nature of HGN was explained:

> "Nystagmus" is a term used to describe an involuntary jerking of the eyeball, a condition that may be aggravated by the effect of chemical depressants on the central nervous system. An inability of the eyes to maintain visual fixation as they are turned from side to side is known as "horizontal gaze nystagmus."

*Id.* at 880-81, 811 P.2d at 490-91 (citations omitted). The Court then described the test as follows:

> The test only requires the objective observations of the person administering the test. No further interpretation of results or procedures is required. If the subject's

---

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

eyes do exhibit nystagmus, that is an indication that the subject may be under the influence of alcohol.

*Garrett*, 119 Idaho at 881, 811 P.2d at 491.  The Court held, based upon authority from other jurisdictions, that the reliability of HGN evidence was "generally accepted in the scientific community" and thereby satisfied the standard for admission of scientific evidence under the standard of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which had long been followed in Idaho.  The Supreme Court therefore held that the HGN evidence was admissible under I.R.E. 702 and that the officer was properly allowed to testify about the defendant's nystagmus and the scientific fact that nystagmus may be an indication of intoxication.  *Garrett*, 119 Idaho at 881-82, 811 P.2d at 491-92.  The Court placed restrictions, however, on the scope of further expert opinion testimony derived from HGN observations, precluding testimony that purported to use HGN evidence to establish a particular BAC level of a defendant.  *Id.*

The Supreme Court again addressed the admissibility of HGN testimony in *Gleason*.  The Court there abandoned use of the *Frye* standard to determine the admissibility of scientific evidence, instead directing that "the appropriate test for measuring the scientific reliability of evidence is I.R.E. 702."  *Gleason*, 123 Idaho at 65, 844 P.2d at 694.  The Court adhered, however, to other portions of the *Garrett* opinion.  Specifically, the Court said that *Garrett* remained "authoritative on the issue of the scientific reliability of HGN test evidence" but that because the Court was abandoning the *Frye* standard, *Garrett* "is not authority for the appropriate test against which such scientific reliability is to be measured."  *Gleason*, 123 Idaho at 65, 844 P.2d at 694.

On appeal, Besaw contends that because the Idaho Supreme Court held in *Garrett* that HGN testimony was admissible under the *Frye* standard, but in *Gleason* abandoned the *Frye* standard and directed that admissibility of such evidence is to be determined solely under I.R.E. 702, the admissibility of HGN testimony under Rule 702 remains an open and unanswered question under Idaho law.  Thus, contends Besaw, the magistrate should have conducted a "Rule 702 hearing" to determine, based upon submission of authority from other jurisdictions, learned treatises and expert testimony, whether HGN evidence is reliable and therefore admissible under I.R.E. 702.  The magistrate concluded that the issue that Besaw contends remains open was actually decided in *Gleason* and therefore a further trial court inquiry on the validity of HGN tests was unnecessary.  Accordingly, the magistrate held that HGN evidence

4

would be admitted in Besaw's case, but that the trooper would be permitted to opine only that nystagmus, in conjunction with evidence from other field sobriety tests, may be an indicator of intoxication.

The magistrate was correct. In *Gleason*, our Supreme Court held that HGN testimony is admissible as reliable under I.R.E. 702, subject to the limits mentioned above regarding the inferences that may be drawn from the presence of nystagmus. When the Court stated in *Gleason* that *Garrett* remained "authoritative on the issue of the scientific reliability of HGN test evidence," the Court necessarily held that the evidence remained admissible in Idaho under I.R.E. 702, which omits the additional hurdle presented in the *Frye* standard requiring general acceptance in the scientific community. Because our Supreme Court has spoken on the issue, it is unnecessary for the proponents of HGN evidence to independently lay a foundation establishing the reliability of this testing method, though it remains necessary to present a foundation establishing the qualifications of the person who administered the test.

### 2. Remaining field sobriety tests

Besaw also challenges the magistrate's admission of the remaining field sobriety tests administered to Besaw: the one-leg stand test and a walk-and-turn test. The magistrate held that Rule 702 did not apply to these tests because the Idaho Supreme Court in *Garrett* said that the tests were not scientific. Besaw claims error, basing his argument on *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999), where the United States Supreme Court said that the foundational requirements for scientific testimony laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588-89 (1993), extend not just to scientific knowledge but also to technical and "other specialized" knowledge under the corresponding federal rule of evidence. Besaw presumes that the trooper's testimony regarding the one-leg stand test and the walk-and-turn test is based on technical or specialized knowledge, and therefore asserts that the magistrate's ruling was incomplete in failing to address whether this testimony was sufficiently reliable to be admissible under I.R.E. 702.

Besaw is incorrect. A witness who testifies as an expert regarding one matter may also serve as a fact witness about other matters that do not require special expertise and therefore are not governed by Rule 702. The trooper's observations of Besaw's performance on the one-leg stand test and walk-and-turn test fall within the latter category. This was noted in *Garrett*, where the Court distinguished the HGN test from other field sobriety tests that called for observation of

5

Garrett's balance. The Court stated, "[T]he HGN test is a different type of test from such sobriety tests as balancing on one leg or walking in a straight line because it relies upon science for its legitimacy rather than upon a fact based in common knowledge." *Garrett*, 119 Idaho at 881, 811 P.2d at 491. Thus, the *Garrett* Court recognized that an officer's testimony that a defendant lost his balance while attempting to stand on one leg or walk a straight line is not governed by Rule 702 because it is not scientific, technical, or specialized in nature. Instead, it is fact testimony, which a jury can evaluate as indicative of intoxication or not, using its common knowledge. The magistrate court correctly declined to require an evidentiary foundation showing the scientific reliability of those field sobriety tests as a condition for admission of the trooper's testimony about Besaw's performance on them.

**B.      The Lifeloc-FC20 Test**

Besaw's remaining three issues relate to the "standard operating procedures" adopted by the Idaho State Police to set procedures and standards for breath testing equipment and administration of breath tests. Pursuant to I.C. §§ 18-8004(4) and 18-8002A(3), the Idaho State Police agency is charged with prescribing by rule approved equipment for testing breath alcohol content and standards for administration of such tests. Although the ISP has adopted administrative "Rules Governing Alcohol Testing," *see* Idaho Administrative Code (IDAPA) 11.03.01, *et seq.*, its standards for evidentiary testing and calibration of equipment are not presented in those rules, but instead are set out in the "Standard Operating Procedure" (SOP) and training manuals. We have treated those documents as "rules" for purposes of judicial review because the parties have done so and because they constitute the only materials by which the ISP has purported to authorize testing instruments and methods.[2] *See In re Hubbard*, 152 Idaho 879, 881-82, 276 P.3d 751, 753-54 (Ct. App. 2012); *In re Schroeder*, 147 Idaho 476, 479 n.3, 210 P.3d 584, 587 n.3 (Ct. App. 2009).

**1.      The fifteen-minute monitoring period**

Besaw contends that his breath test was inadmissible because the trooper did not adequately monitor him for fifteen minutes before administering the test as required by Standard Operating Procedure 6.1 (11/1/10), which states:

---

[2]      We have not, however, held that these SOPs and manuals actually constitute "rules" or that the ISP has "prescribed by rule" testing instruments and methods as contemplated by I.C. § 18-8002A(3); that issue has never been presented to this Court.

Prior to evidentiary breath alcohol testing, the subject/individual should be monitored for at least fifteen (15) minutes. Any material which absorbs/adsorbs or traps alcohol should be removed from the mouth prior to the start of the 15 minute waiting period. During the monitoring period the subject/individual should not be allowed to smoke, drink, eat, or belch/burp/vomit/regurgitate.

The purpose of the monitoring period is "to rule out the possibility that alcohol or other substances have been introduced into the subject's mouth from the outside or by belching or regurgitation." *Bennett v. State, Dep't of Transp.*, 147 Idaho 141, 144, 206 P.3d 505, 508 (Ct. App. 2009); *State v. Carson*, 133 Idaho 451, 453, 988 P.2d 225, 227 (Ct. App. 1999). To satisfy the observation requirement, the level of surveillance "must be such as could reasonably be expected to accomplish" that purpose. *Bennett*, 147 Idaho at 144, 206 P.3d at 508. "This foundational standard ordinarily will be met if the officer stays in close physical proximity to the test subject so that the officer's senses of sight, smell and hearing can be employed." *State v. DeFranco*, 143 Idaho 335, 338, 144 P.3d 40, 43 (Ct. App. 2006). However, the monitoring officer is not required to stare fixedly at the subject. "So long as the officer is continually in [a] position to use his senses, not just sight, to determine that the defendant did not belch, burp or vomit during the [monitoring] period," the observation complies with the rule. *Bennett*, 147 Idaho at 144, 206 P.3d at 508. However, if the officer's ability to supplement his visual observation of the subject with his other senses is substantially impaired by such factors as noise, the officer's own hearing impairment, or the officer's distance from or position facing away from the subject during the monitoring period, the monitoring requirement may not be satisfied. *Carson*, 133 Idaho at 453, 988 P.2d at 227.

When a decision on a motion addressing the admissibility of evidence is challenged, we defer to the trial court's findings of fact supported by substantial and competent evidence. *State v. Reese*, 132 Idaho 652, 653, 978 P.2d 212, 213 (1999). The power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Decker*, 152 Idaho 142, 145, 267 P.3d 729, 732 (Ct. App. 2011); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

Based upon the trooper's testimony and a video of the encounter, the magistrate found that the trooper "stood approximately two to three feet away from the Defendant, facing him at all times so that he could observe him for fifteen (15) minutes before administering breath

testing." Besaw contended, however, that the trooper's vision and attention was fatally distracted when he looked toward and spoke to three individuals who approached him during the monitoring period. Addressing these concerns, the magistrate credited the trooper's testimony and found that "he did not take his focus off of the defendant and did not move away even though he was briefly distracted by a Lewiston police officer, again by a passenger in the defendant's vehicle, and finally by an individual arriving to pick up another passenger." The magistrate further found that the trooper put "himself in a physical position that allowed him to utilize not only his sight but all his senses to accomplish the purposes of the monitoring period," and concluded that the trooper's "attention was not impeded to such a degree that his various senses were diverted from the defendant."

These findings are supported by the evidence. The trooper testified that during the monitoring period Besaw was seated in the backseat of the patrol car with the back door open, and the officer stood, bent over, watching him. The officer acknowledged that he spoke briefly with another officer, Besaw's passenger who emerged from Besaw's vehicle during the monitoring period, and the passenger's wife. However, the trooper also said his head was roughly two or three feet from Besaw's head as he conducted the observation, and that the trooper never turned his back or moved away during the observation period. The video camera that recorded the stop was not pointed toward Besaw or the officer during the monitoring period, but the audio portion confirms the trooper's testimony that he had only brief verbal exchanges with the three people who approached him. From this evidence, the magistrate court could reasonably find that the trooper's monitoring was such "as could reasonably be expected to accomplish the purpose of the requirement." *Bennett*, 147 Idaho at 144, 206 P.3d at 508. This Court will not reweigh the evidence and substitute our judgment for that of the trial court. Substantial and competent evidence in the record supports the magistrate court's finding that the trooper adequately monitored Besaw for the requisite time period.

### 2. Performance verification

Besaw next contends that the magistrate erred in concluding that the "performance verification" of the Lifeloc FC20 instrument used to test his breath was properly conducted according to the standards in the SOPs and manual, and that the test results therefore were admissible at his trial pursuant to I.C. § 18-8004(4). A performance verification is a "verification of the accuracy of the breath testing instrument utilizing a simulator and a

8

performance verification solution." SOP 6.0 (effective 11/1/10). A performance verification solution is a "premixed ethyl alcohol solution used for field performance verifications." *Id.* A performance verification on a Lifeloc FC20 is done by attaching the solution to the instrument with a tube, and blowing into the tube through a mouthpiece until a result is obtained. Idaho LIFELOC FC20 Reference Manual (Rev. Effective 8/20/10). A performance verification consists of two samples, SOP 5.1.2, and is acceptable according to the ISP's standards if each sample falls within 10 percent above or below the particular solution's target value. SOP 5.1.5.

There are three SOP provisions implicated by the issue presented:

> 5.1.3 A performance verification of the Alco-Sensor and Lifeloc FC20 instruments using a 0.08 or 0.20 performance verification solution must be performed within 24 hours, before or after an evidentiary test to be approved for evidentiary use. Multiple breath alcohol tests may be covered by a single performance verification. Reference 5.1.4.1 for clarification on the use of the 0.20 solution in this capacity.
> . . . .
> 5.1.4 A 0.20 performance verification should be run and results logged once per calendar month and replaced with fresh solution approximately every 25 verifications or until it reaches its expiration date, whichever comes first.
>> **NOTE:** The 0.20 performance verification was implemented for the sole purpose of supporting the instruments' results for an 18-8004C charge. Failure to timely perform a 0.20 performance verification will not invalidate tests performed that yield results at other levels or in charges other than 18-8004C.
>> 5.1.4.1 The 0.20 performance verification satisfies the requirement for performance verification within 24 hours, before or after an evidentiary test at any level. The 0.20 performance verification solution should not be used routinely for this purpose.

Here, it is uncontested that the officer conducted a performance evaluation on the Lifeloc machine used in this case within twenty-four hours after Besaw's test using a .08 solution and that the samples fell within the acceptable range. It is also uncontested that a successful .20 performance verification was done within a month of Besaw's test. Besaw contends, however, that because his test returned BAC samples of .219 and .201 and he was charged with excessive driving under the influence with a BAC of .20 or more, the SOPs required that the performance verification in his case had to be performed with a .20 solution. The magistrate rejected this contention, holding that the plain language of the rules allowed either solution level to be used for the twenty-four-hour verification. On intermediate appeal, the district court agreed with the magistrate. Besaw continues with his claim of error in this appeal.

9

The interpretation of an administrative rule is an issue of law over which we exercise free review, *Mason v. Donnelly Club*, 135 Idaho 581, 586, 21 P.3d 903, 908 (2001), and we interpret the ISP's standard operating procedures as we would administrative rules. *Wheeler v. Idaho Transp. Dep't*, 148 Idaho 378, 384, 223 P.3d 761, 767 (Ct. App. 2009). When interpreting a rule, we will construe it as a whole to give effect to the intent of the promulgating entity. *See George W. Watkins Family v. Messenger*, 118 Idaho 537, 539-40, 797 P.2d 1385, 1387-88 (1990), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011); *Zener v. Velde*, 135 Idaho 352, 355, 17 P.3d 296, 299 (Ct. App. 2000). Interpretation of a rule should begin, therefore, with an examination of its literal words. *Mason*, 135 Idaho at 586, 21 P.3d at 908. The language of the rule should be given its plain, obvious, and rational meaning. *Id.*

Here, we agree with the magistrate's determination. The plain language of SOP 5.1.3 allows a twenty-four-hour verification to be performed with either a 0.08 *or* a 0.20 performance verification solution. SOP 5.1.4.1 confirms that either a 0.08 *or* a 0.20 performance verification solution may be used for the twenty-four-hour verification because it recognizes that the *monthly* "0.20 performance verification satisfies the requirement for performance verification within 24 hours before or after an evidentiary test at any level," but also states that the "0.20 performance verification solution should not be used routinely for this purpose." The "note" to rule SOP 5.1.4 which states that the "0.20 performance verification was implemented for the sole purpose of supporting the instruments' results for an 18-8004C charge" does not change this directive as it refers to the rule's recommendation that a "0.20 performance verification should be run and results logged once per calendar month."

In summary, the SOP provisions simply do not require a .20 solution performance verification within 24 hours in order to support prosecution of an I.C. § 18-8004C excessive alcohol charge. The magistrate did not err in rejecting Besaw's argument to the contrary.

3.    **Whether the ISP has abdicated its duty to adopt standards to ensure the reliability of BAC test results**

Besaw's final claim is that his breath tests should not have been admitted into evidence because he has demonstrated "a lack of standards in breath testing as required by Idaho Code § 18-8004(4)." Besaw argues that although the ISP is charged by statute with adopting alcohol concentration testing *standards* meant to ensure the reliability of test results, the agency has abdicated this responsibility by replacing standards with testing *recommendations* that are not

10

meant to ensure the accuracy of test results but, rather, to facilitate the admissibility of test results.

With respect to the ISP's responsibility to adopt standards that will ensure test accuracy, Besaw refers to this Court's comments in *State v. Bell*, 115 Idaho 36, 764 P.2d 113 (Ct. App. 1988), discussing a prior version of I.C. § 18-8004 in which responsibility for authorizing alcohol content testing procedures was assigned to the Idaho Department of Health and Welfare, a responsibility that has subsequently transferred to the ISP. In *Bell* we stated:

> The Legislature has enacted a statutory scheme which allows an expedient method for admitting a blood-alcohol test result into evidence without the need for some expert testimony.
> . . . .
> When this proposed statute was presented to the Legislature the statement of purpose accompanying the legislation explained that expert witness testimony was an unnecessary burden on the state. Such testimony, if used merely to establish a foundation, provided superfluous verification of a test procedure which the Legislature believed to produce an "extremely reliable" result.
> Inherent in this statutory scheme . . . is an awareness by the Legislature of the need for uniform test procedures. An "extremely reliable" test result can only be the product of a test procedure which from previous use is known to be capable of producing an accurate result. This benefit is best provided by strict adherence to a uniform procedure.
> . . . The adoption of the particular test procedure merely recognizes the validity and reliability of that particular accepted test. It must still be established at trial that those procedures which ensure the reliability and in turn the accuracy of the test have been met. Absent such a showing, the expedient scheme adopted by the Legislature fails to guarantee the admission of reliable evidence.

*Bell*, 115 Idaho at 39, 764 P.2d at 116.

As the foundation for his argument that the ISP has not complied with its statutory duty to adopt breath testing standards, Besaw relies upon the dissenting opinion in *Wheeler*, 148 Idaho 378, 223 P.3d 761. That dissent criticized the majority's interpretation of the word "should" in the ISP's breath testing standards as prescribing something that is optional rather than mandatory because, when so interpreted, the standards would not comply with the ISP's statutory responsibility to prescribe "requirements" for evidentiary testing and calibration of testing equipment under I.C. §§ 18-8002A(3) and 18-8004(4). *See Wheeler*, 148 Idaho at 389, 223 P.3d at 772 (Lansing, J. dissenting). Besaw directs our attention to the following statement in the *Wheeler* dissent:

As the legislative statements of purpose indicate, this statutory scheme is intended to streamline trials and reduce the costs of prosecution while at the same time assuring the accuracy of the tests. It can meet this objective and can accord with due process and demands of fundamental fairness only if there actually exist promulgated standards for administration of BAC tests that ensure accurate and reliable test results. In other words, the *quid pro quo* for the convenience and economy of admitting test results pursuant to I.C. § 18-8004(4) is that the ISP must promulgate ascertainable standards that, if complied with, will yield accurate BAC testing.

*Id.* at 387, 223 P.3d at 770. Besaw asserts that after *Wheeler*, the ISP has continued to change a number of former "must" testing requirements to "should" recommendations within the SOPs, not because the procedures are inessential to test accuracy but to eliminate hurdles to admissibility of the test results.

To support his argument, Besaw relies upon a number of emails to, from, and between ISP employees, various county prosecutors, and other persons, most of whom are affiliated with law enforcement or prosecutorial agencies.[3] The emails discuss, among other things, problems encountered in criminal prosecutions and license suspension proceedings arising from the SOP breath-testing requirements. Discussions include suggestions to insert "wiggle room" language and "weasel words" into certain SOPs to prevent test results being deemed inadmissible because the testing officer failed to follow the procedure.[4] Other emails discussed the desire to exclude defense attorneys from a "list serv" that would be available to testing operators and prosecutors to access information about breath testing. Besaw asserts that if the *Wheeler* Court had been privy to the emails that he presented to the trial court, the *Wheeler* dissent would have won the day because the emails show that the SOPs are formulated without regard to the accuracy of the test results that they will yield.

It is problematical for Besaw's argument that the analysis from *Wheeler* upon which he relies was in a *dissent*. By definition, it did not command agreement from a majority of this Court. Specifically, the majority opinion did not adopt the dissent's view that nonmandatory

---

[3] Besaw acquired these records not through discovery in the criminal case but by submitting a public records request pursuant to I.C. § 9-338.

[4] Besaw has not identified any changes from "must" to "should" or any addition of "weasel words" to the SOPs as a result of these emails.

standards would be tantamount to no standards at all. It is the majority opinion in *Wheeler* that constitutes precedent to which this Court must adhere under principles of *stare decisis*. *See State v. Grant*, 154 Idaho 281, 287, 297 P.3d 244, 250 (2013); *State v. Forbes*, 152 Idaho 849, 852-53, 275 P.2d 864, 867-68 (2012); *State v. Card*, 121 Idaho 425, 440-44, 825 P.2d 1081, 1096-1100 (1991) (McDevitt, J. concurring).

Although Besaw has exposed some troubling information about the manner in which the SOPs for breath testing have been developed or amended, we are not persuaded that he has demonstrated that the SOP procedures are incapable of yielding accurate tests. Besaw contends that the SOPs are so strewn with "weasel words" and "wiggle room" that they lack scientific basis and permit testing procedures that will not yield accurate tests, but there is no evidence in the record to support that conclusion. To be sure, the emails and memos to and from ISP personnel are disturbing, for some comments and suggestions lacked any apparent regard for the way proposed changes could affect the validity of the tests. As Besaw alleges, some participants seemed to view the ISP's task as being to thwart all possible defense challenges to the admission of breath tests rather than to adopt standards that will maximize the accuracy of tests upon which individuals may be convicted of serious crimes and deprived of their liberty. Further, it appears that there was a conscious avoidance of any opportunity for suggestions or critiques from persons outside the law enforcement community.[5] While we do not endorse or condone such an approach to the ISP's statutorily-assigned duty to define breath testing procedures and standards, we cannot say that the emails in and of themselves, or any other evidence in the record, establishes that the test procedures actually authorized by the SOPs and applied in Besaw's case are incapable of producing reliable tests.[6] Therefore, we find no error in the magistrate court's denial of Besaw's motion to exclude the test results from evidence.

---

[5]    If the breath testing standards had been promulgated as formal administrative rules pursuant to the Idaho Administrative Procedures Act, such avoidance of outsider comments would have been impossible, for that Act requires public notice and a period for public comment, as well as legislative review, before adoption, amendment, or repeal of an administrative rule. *See* I.C. §§ 67-5220 to 67 -5224.

[6]    Unlike the driver in *Wheeler*, Besaw does not contend that in administering the breath test, the trooper failed to perform a specific procedure labeled in the SOPs as something that "should" have been done and that his failure could have affected the accuracy of his test results.

## IV.

## CONCLUSION

Besaw has not demonstrated error by the magistrate court in denying his pretrial motions for the exclusion of evidence. Therefore, the district court's appellate decision affirming the judgment of conviction is affirmed.

Judge GRATTON and Judge MELANSON **CONCUR.**